CECELIA CHAMPAGNE, ADMINISTRATRIX (ESTATE OF WILFRED CHAMPAGNE), ET AL. *v.* RAYBESTOS-MANHATTAN, INC. (13496)

HEALEY, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued January 12—decision released August 8, 1989

*James E. Coyne,* for the appellant-appellee (defendant).

*Matthew Shafner,* with whom were *Frank N. Eppinger* and, on the brief, *Mark Oberlatz,* for the appellee-appellant (plaintiff).

ARTHUR H. HEALEY, J. This appeal arises out of an action brought by the plaintiff, Cecelia Champagne, individually and on behalf of Wilfred Champagne as administratrix of his estate, for the injury and death of Wilfred Champagne as a result of his exposure to asbestos while employed by the General Dynamics Corporation, Electric Boat Division (Electric Boat) in Groton. The case began as an amendment, dated February 22, 1980, to an existing multiparty complaint filed on behalf of past and present employees of Electric Boat. In the two counts of the amended complaint concerning the plaintiff, one sought compensatory and punitive damages on behalf of Wilfred Champagne and the other sought compensatory damages for Cecelia Champagne for loss of consortium.

The final amended complaint, no longer part of the complaint involving many other employees, dated November 18, 1987, contained three counts. In the first count the plaintiff sought compensatory damages on behalf of Wilfred Champagne as administratrix of his estate. The second count sought punitive damages. The third count sought damages for Cecelia Champagne individually for loss of consortium. After a jury trial and decisions on posttrial motions, the trial court, *Koletsky, J.,* rendered judgment in the amount of $163,361.52 with costs. From this judgment, the defendant appeals and the plaintiff cross appeals. We discuss the claims on the appeal and the cross appeal, which are in large measure interrelated, in their natu-

ral sequence as opposed to discussing the appeal first and the cross appeal second. We find error in part on the appeal and no error on the cross appeal.

The jury reasonably could have found the following facts, which we supplement as the issues require. Wilfred Champagne (decedent) worked at Electric Boat as a pipe coverer from 1959 to 1979. Pipe coverers at Electric Boat, such as the decedent, were responsible for insulating various systems during the construction and overhaul of submarines. This insulation process often involved the handling of products containing asbestos. Although there was no testimony from any of the witnesses that they specifically recalled seeing the decedent handling such products manufactured by the defendant, there was testimony that in performing their duties all pipe coverers did indeed handle such products on a regular basis. During both the installation and replacement of the insulation, the pipe coverers were subject to a work environment that was filled with dust that, at least in part, was created by work with the products containing asbestos. There was testimony that the decedent often returned home from work covered with this dust that contained asbestos.

From 1959 to 1975, the defendant supplied asbestos cloth to Electric Boat for use in its submarines. During that time, Electric Boat constructed approximately fifty to fifty-five submarines, each utilizing about 90,000 square feet of asbestos cloth. The defendant sold at least $130,000 worth of asbestos-containing products to Electric Boat between 1959 and 1973. In comparison, a former salesman from Eastern Refractory Company, Inc., testified that during the years that he sold asbestos-containing products for that company, which included the years that the decedent was employed as a pipe coverer, his company had annual sales of up to $350,000 to Electric Boat. Eastern Refractory sold asbestos-containing products that were manufactured

by companies other than the defendant.[1] A former sales manager from Cummings Insulation testified that from 1962 or 1963 to the early 1970s, his company annually sold approximately $250,000 worth of asbestos-related products to Electric Boat that were not manufactured by the defendant. Through a deposition of the former national sales manager of the defendant corporation that was introduced at trial, the jury was presented with testimony that the asbestos-containing products that the defendant sold to Electric Boat generally were comprised of 75 to 90 percent asbestos.[2]

In 1972, after the Occupational Safety and Health Administration issued certain regulations, the defendant placed health warnings on its asbestos-containing products. These warnings, however, were placed on the outer wrappings of the products and may not have been seen by many of the pipe coverers at Electric Boat.

On or about March 25, 1975, Electric Boat received a "claim" from the decedent for workers' compensation benefits under the Longshore Harbor Workers' Compensation Act. In the space on the compensation form where the injury is described there appears only the word "asbestos." The former union steward for the pipe fitters local 620 that included the pipe coverers at Electric Boat, Charles Ballato, testified that in 1975 one of their members was informed by his doctor that he had asbestosis. As a result of this, the union con-

[1] There was testimony that indicated that Eastern Refractory may have sold a small amount of the defendant's products in 1962.

[2] In addition to the evidence of the decedent's exposure to the defendant's products, the plaintiff also introduced evidence indicating that the defendant knew of the health dangers posed by exposure to asbestos-containing products, yet it did not inform its customers of this danger until 1972. Furthermore, the plaintiff introduced evidence that in the 1930s the defendant suppressed the publication of medical studies concerning asbestos exposure, declined to study further the effects of asbestos exposure, and tried to discredit a doctor who was researching the effects of asbestos exposure and who had sponsored a medical conference on the topic.

tacted Dr. Irving J. Selikoff at Mount Sinai Hospital in New York and asked Selikoff and his staff to examine all of the union pipe coverers at Electric Boat. Before Selikoff examined the workers, the union had each worker fill out the Department of Labor's workers' compensation form. On the form that the decedent allegedly filled out, plaintiff's exhibit 56, either Ballato or James Sweet, the pipe coverers' steward at the time, wrote in "asbestos" in the space of the form that said "describe in full how the accident occurred."[3] Ballato stated that he or Sweet wrote the word "asbestos" in because "[w]e were concerned, you know, that other members in that department, another member in that department had an asbestos-related disease and we wanted to make sure that everyone had one filled out in case they were—had the same problem."

Following this examination by Selikoff and his staff, the decedent received a letter dated October 23, 1975, that stated, "Some changes were found in your chest x-ray. We advise you to discuss these plans with your personal physician so that adequate follow-up may be planned." In light of the decedent's response to a questionnaire at the time of the examination in which he stated that he had smoked one to one and one-half packs of cigarettes a day for thirty years, the letter also stated: "It is strongly advised that you discontinue cigarette smoking."

In the fall of 1978, the decedent received a letter from Dr. Edward A. Gaensler of the Boston University Medical Center dated September 25, 1978, which advised him that he had "a moderate degree of asbestosis." This letter also advised the decedent to stop smoking. In 1979, the decedent stopped working at Electric Boat.

In late 1984 or early 1985, the decedent developed lung cancer. Dr. Nagi Kamireddy testified that, in his

---

[3] Ballato later testified, upon inquiry by the trial judge, that the form was filled out after the visit with Selikoff.

view, the cancer was the result of "asbestos exposure along with the incidence of smoking." On May 3, 1985, at the age of sixty, the decedent died. The cause of death noted on his certificate of death was squamous cell carcinoma of the right middle and right lower lobe.

The decedent and the plaintiff were married on August 21, 1948. The couple had three daughters. The plaintiff testified that in 1979, after the decedent had become ill, he moved out of the house at 52 Carver Avenue in Norwich that he and the plaintiff had occupied together until that time. According to the plaintiff, the decedent moved out to live with friends and he occasionally returned home. In contrast, the defendant introduced the testimony of Katherine Davis who stated that, during the period from 1975 to 1977, the decedent had been dating her mother and during that time the decedent lived for a time at his brother's house. Additionally, Davis testified that from 1977 until the time that he died, the decedent had lived with her mother at 13 Marjorie Street in Mystic. Davis said that the decedent kept his clothes at her mother's house, that her mother and the decedent lived as husband and wife, and that the decedent died at 13 Marjorie Street in Mystic. The plaintiff and the defendant introduced evidence indicating that the decedent received mail at 52 Carver Street and 13 Marjorie Street, respectively. Also, the plaintiff testified that, although she and the decedent filed separate tax returns from 1979 to 1985, his tax forms were mailed to 52 Carver Street. Finally, the plaintiff testified that she paid the decedent's medical and funeral bills.

This case proceeded to trial before a jury on December 1, 1987. The final amended complaint upon which the case was based was dated November 18, 1987, and sounded in three counts. Prior to trial, counsel agreed to try the case under the common law theory of strict

product liability with the exception that statutory "comparative responsibility" would apply.

On December 15, 1987, the jury returned the following verdicts:

"PLAINTIFF'S VERDICT ON FIRST COUNT

In this case the Jury finds the issues on the first count for the Plaintiff Cecelia Champagne, Administratrix, as against the Defendant Raybestos-Manhattan, Inc. and finds the 100 percent value of the Plaintiff's claim on said first count to be $144,673.

The Jury further finds the Plaintiff to be 75 percent contributorily negligent and Plaintiff's net damages to be $36,168.25.

P. R. Marblo [signed]
Foreperson

N.B. Foreperson must sign name in ink.

Ordered, accepted, and recorded.

Koletsky, J.

12/15/87

4:45 P.M."

"PLAINTIFF'S VERDICT ON SECOND COUNT

In this case the Jury finds the issues for the Plaintiff Cecelia Champagne, Administratrix, as against the Defendant Raybestos-Manhattan, Inc. on the second count, in that she is entitled to recover punitive or exemplary damages, to be set by the Court.

P. R. Marblo [signed]
Foreperson

N.B. Foreperson must sign name in ink.

Ordered, accepted, and recorded.

/Koletsky, J./

12/15/87

4:45 P.M."

The defendant's brief summarized the plaintiff's verdict that was returned on the third count on December 15, 1987, as follows: "As to the third count claiming damages for loss of consortium on behalf of the plaintiff Cecelia Champagne individually, and specifically limited to such damages as were found to have been sustained prior to the death of Wilfred Champagne, the jury found the 100 percent value of said damages to be $144,673.00 which it then reduced by 80 percent representing the comparative negligence of Wilfred Champagne, rendering a verdict in favor of Cecelia Champagne individually in the amount of $28,934.60." We set out the defendant's summary as to the verdict returned by the jury on December 15, 1987, on the third count because the record does not contain the original verdict on that count.

According to the defendant, after accepting and recording the verdicts on December 15, 1987, the trial court noticed a typographical error on the verdict form for the third count. The error, we are told, led the jury to believe incorrectly that the 100 percent value of compensation for lost consortium in the third count had to be the same as the amount of compensation awarded in the first count.[4]

On December 16, 1987, according to counsel, the trial court vacated its prior acceptance and recording of the verdict on the third count, prepared another verdict in the third count, recharged the jury on "comparative responsibility" and sent it back to deliberate again. The jury returned the following verdict on the third count:

"PLAINTIFF'S VERDICT ON THIRD COUNT

In this case the Jury finds the issues on the third count for the Plaintiff Cecelia Champagne, as against

---

[4] This court was not provided with a transcript of these proceedings or any subsequent proceedings except for the trial court's ruling on various motions on February 8, 1988.

the Defendant Raybestos-Manhattan, Inc. and finds the 100 percent value of the Plaintiff's claim on said third count to be $320,000.

The Jury further finds the Plaintiff to be 75 percent contributorily negligent and Plaintiff's net damages to be $80,000.

> P. R. Marblo
> Foreperson

N.B. Foreperson must sign name in ink.

Ordered, accepted, and recorded.

/Koletsky, J./

12/16/87

10:50 A.M.''

The defendant subsequently filed a motion to set aside all three verdicts and a motion for an order of remittitur as to the verdicts on counts one and three. The plaintiff also filed a motion to set aside the verdicts and sought an additur. The motions were all denied on February 8, 1988. At that time, the trial court refused to disturb the judgment of $36,168.25 on the first count and that of $80,000 on the third count. On the second count, in accordance with a calculation method purportedly agreed to by the parties, the trial court rendered a judgment of $42,835.52.

From this judgment, the defendant appealed on February 29, 1988. The plaintiff filed a cross appeal on March 7, 1988. On September 12, 1988, we transferred this case to ourselves pursuant to Practice Book § 4023.

I

Before analyzing the claims of error advanced by the parties, we must address a threshold issue. That issue

is whether this case was properly tried using the common law and certain statutes based on purported pretrial agreements of the parties and the trial court.

It appears that the parties stipulated before trial that this case was to be tried using the common law of strict product liability, with the exception that some form of "statutory comparative responsibility" would apply. There is no indication that this stipulation was ever entered into the record. Although at oral argument the parties seemed to agree that the case was tried on the theory of common law strict product liability, there were inconsistent statements from counsel as to which statutory scheme of "comparative responsibility" was used, i.e., General Statutes § 52-572*l*, which applies to strict tort liability actions pending or brought after June 7, 1977, or General Statutes § 52-572o, which applies to product liability claims as defined in General Statutes § 52-572m and accruing after October 1, 1979. "This aspect of the case once again illustrates the hazards of making off-the-record stipulations relative to matters arising in the course of a trial. The court and counsel can best assure themselves of protection from misunderstanding and faults of recollection by having a transcript available for review by this court and by not bypassing the services of the court reporter." *Nair* v. *Thaw,* 156 Conn. 445, 455, 242 A.2d 757 (1968).

The temporal framework involved in this case is as follows. On June 7, 1977, General Statutes § 52-572*l*[5] took effect. The thrust of this statute was to remove

---

[5] General Statutes § 52-572*l* provides: "STRICT TORT LIABILITY, CONTRIBUTORY NEGLIGENCE AND COMPARATIVE NEGLIGENCE NOT BAR TO RECOVERY. In causes of action based on strict tort liability, contributory negligence or comparative negligence shall not be a bar to recovery. The provisions of this section shall apply to all actions pending on or brought after June 7, 1977, claiming strict tort liability notwithstanding the date on which the cause of action accrued. Nothing in this section shall be construed as barring the defense of misuse of the product or the defense of knowingly using the product in a defective condition in an action based on strict tort liability."

contributory negligence and comparative negligence as a "bar to recovery" in strict tort liability actions pending on or brought after June 7, 1977. At some time prior to September, 1978, it would appear that the decedent knew or should have known that he had an asbestos related disease.[6] In 1979, the legislature enacted what is sometimes referred to as the strict product liability act. General Statutes § 52-572m et seq. This act became effective on October 1, 1979. See Public Acts 1979, No. 79-483. As part of the product liability act, the legislature repealed and replaced General Statutes § 52-577a, the statute of limitations for product liability actions. After subsequent repeal and substitution, § 52-577a was made applicable to "all product liability claims brought on or after October 1, 1979." See Public Acts 1979, No. 79-631, § 106. On February 22, 1980, the plaintiff instituted this action.

This sequence of events poses the following questions: (1) was it proper for the parties to decide, and for the trial court to acquiesce in their decision, to try this case under the theory of common law strict product liability; (2) if the common law of strict product liability was properly applied, was it proper for the court to apply "statutory comparative responsibility"; and (3) even if the trial court was correct in applying the common law of strict product liability to this case, does the statute of limitations for product liability cases contained in General Statutes § 52-577a apply?

In answer to the first inquiry, we conclude that the trial court properly applied the common law of strict product liability in this case. "Substantive rights of the parties are fixed at the date upon which the cause of

[6] In September, 1978, the plaintiff received a letter from Dr. Edward A. Gaensler of the Boston University Medical Center informing him that he had "a moderate degree of asbestosis." The plaintiff's counsel suggests that this is the point when the plaintiff knew or should have known of his asbestos related disease.

action accrued." *Batchelder* v. *Tweedie,* 294 A.2d 443, 444 (Me. 1972); *Morgan* v. *McDermott,* 382 Mich. 333, 345, 169 N.W.2d 897 (1969); see *Hart* v. *Board of Examiners of Embalmers,* 129 Conn. 128, 131–32, 26 A.2d 780 (1942). In Connecticut, a cause of action accrues when a plaintiff suffers actionable harm. *Catz* v. *Rubenstein,* 201 Conn. 39, 43, 513 A.2d 98 (1986). Actionable harm occurs when the plaintiff discovers or should discover, through the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused such injury. Id.; see *Lambert* v. *Stovell,* 205 Conn. 1, 6, 529 A.2d 710 (1987).

From the record that we do have, we can determine that the plaintiff's cause of action in this case accrued at a time no earlier than February 22, 1978, and no later than late September, 1978. The trial judge instructed the jury that the applicable statute of limitations in this case required the plaintiff to commence the action within two years from the date that it accrued. Because the jury did not find for the defendant on the statute of limitations, we can infer that the plaintiff's cause of action did not accrue earlier than two years before the action was filed on February 22, 1980.[7] Further, the plaintiff's counsel argued at trial that the letter to the decedent from the Boston University Medical Center, dated September 25, 1978, triggered the statute of limitations, i.e., upon receipt of that letter the decedent knew or should have known of his injury and the causal connection with the defendant. Therefore, we can conclude that the plaintiff's cause of action accrued sometime between February 22, 1978, and late September, 1978.

Because the cause of action accrued in 1978, we know that common law theories of strict product liability

[7] Of course, this analysis assumes that the jury's finding that the cause of action accrued after February 22, 1978, was not in error. For reasons set out, infra, we find that the jury did not commit error in so finding.

apply to this case with the exception of General Statutes § 52-572*l*, which applied to all actions pending or brought after June 7, 1977. As stated earlier, the applicable substantive law is that in effect at the time that the action accrues. The only exception to this rule is when the legislature enacts substantive legislation and unequivocally declares that the new legislation is to be given retroactive effect. *State* v. *Lizotte,* 200 Conn. 734, 740–41, 517 A.2d 610 (1986); *Hunter* v. *Hunter,* 177 Conn. 327, 331, 416 A.2d 1201 (1979). Although we conclude that the product liability act, General Statutes § 52-572m et seq., which includes the comparative responsibility provision contained in § 52-572o, did effect substantive changes in the law of product liability as it existed prior to October 1, 1979; see *Collucci* v. *Sears, Roebuck & Co.,* 585 F. Sup. 529, 532 (D. Conn. 1984); there is no indication that the legislature intended the act to apply to actions that accrued before its effective date. See id. Our statement in *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 512 A.2d 893 (1986), that the product liability act is an exclusive remedy for product liability claims accruing after October 1, 1979, is not controlling in this case because in the case before us the cause of action accrued before the effective date of the 1979 product liability statutes. See General Statutes § 52-572m et seq. Therefore, the applicable substantive law in this case was the common law of product liability as modified by General Statutes § 52-572*l*.

II

Having determined the applicable substantive law in this case, we still are confronted with the question of which statute of limitations is applicable. We also must determine whether the trial court committed reversible error in its instructions to the jury on the statute

of limitations and whether the jury reasonably could have found that the action was instituted within the applicable statute of limitations.

In its first special defense, the defendant claimed that the plaintiff's action was barred by the statute of limitations as set forth in General Statutes §§ 52-584[8] and 52-577a.[9] The limitation of § 52-584, entitled "Limitation of action for injury to person or property,"

[8] General Statutes § 52-584 provides: "LIMITATION OF ACTION FOR INJURY TO PERSON OR PROPERTY. No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

[9] General Statutes § 52-577a provides: "LIMITATION OF ACTION BASED ON PRODUCT LIABILITY CLAIM. (a) No product liability claim as defined in section 52-572m shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered except that, subject to subsections (c), (d) and (e), no such action may be brought against any party nor may any party be impleaded pursuant to subsection (b) later than ten years from the date that the party last parted with possession or control of the product.

"(b) In any such action a product seller may implead any third party who is or may be liable for all or part of the claimant's claim, if such third party defendant is served with the third party complaint within one year from the date the cause of action brought under subsection (a) of this section is returned to court.·

"(c) The ten-year limitation provided for in subsection (a) shall not apply to any product liability claim brought by a claimant who is not entitled to compensation under chapter 568, provided the claimant can prove that the harm occurred during the useful safe life of the product. In determining whether a product's useful safe life has expired, the trier of fact may consider among other factors: (1) The effect on the product of wear and tear or deterioration from natural causes; (2) the effect of climatic and other local conditions in which the product was used; (3) the policy of the user and similar users as to repairs, renewals and replacements; (4) represen-

restricts the initiation of any action "to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium" to a period within two years from the date that the injury is sustained or should have been discovered. The section further provides that no action "may be brought more than three years from the date of the act or omission complained of." General Statutes § 52-577a, entitled "Limitation of action based on product liability claim," provides that a product liability claim as defined by the product liability act, General Statutes § 52-572m et seq., must be brought within three years from the date when the injury is sustained or should have been discovered. The section also states that no action may be brought against a party later than ten years from the date that the party last had control or possession of the product. General Statutes § 52-577a (e) now, however, preempts this ten year limitation with respect to claims involving asbestos-containing products and provides that no action may

tations, instructions and warnings made by the product seller about the useful safe life of the product; and (5) any modification or alteration of the product by a user or third party.

"(d) The ten-year limitation provided for in subsection (a) shall be extended pursuant to the terms of any express written warranty that the product can be used for a period longer than ten years, and shall not preclude any action against a product seller who intentionally misrepresents a product or fraudulently conceals information about it, provided the misrepresentation or fraudulent concealment was the proximate cause of harm of the claimant.

"(e) The ten-year limitation provided for in subsection (a) shall not apply to any product liability claim, whenever brought, involving injury, death or property damage caused by contact with or exposure to asbestos, except that no such action may be brought by the claimant later than thirty years from the date that the claimant last had contact with or exposure to asbestos.

"(f) The definitions contained in section 52-572m shall apply to this section.

"(g) The provisions of this section shall apply to all product liability claims brought on or after October 1, 1979."

be brought after thirty years from the date of the claimant's last contact or exposure to asbestos.

During trial, the defendant moved for a directed verdict based upon the statute of limitations. As authority, defense counsel cited General Statutes §§ 52-584 and 52-577, not § 52-577a. General Statutes § 52-577, entitled "Action founded upon a tort," provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."[10]

An examination of the charge to the jury reveals that the trial court instructed the jury based on § 52-584, the two year statute of limitations. The trial court said, "Now, this action was begun on February 22nd, 1980 and the statute of limitations that is applicable in this case is two years." The application of this statute of limitations was an error, although a harmless error.

" ' "A statute of limitations is generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action. *Jones Destruction, Inc.* v. *Upjohn,* 161 Conn. 191, 195, 286 A.2d 308 (1971)." *Collucci* v. *Sears, Roebuck & Co.,* [supra].' *Moore* v. *McNamara,* [201 Conn. 16, 22, 513 A.2d 660 (1986)]." *Ecker* v. *West Hartford,* 205 Conn. 219, 231–32, 530 A.2d 1056 (1987). Section 52-577a does not create a right of action in the product liability context. That right of action is created by the common law or the product liability act. Thus, § 52-577a must be considered procedural. Because "procedural statutes will be applied retrospectively absent a contrary legislative intent in the civil field"; *State* v. *Paradise,* 189 Conn. 346, 351, 456 A.2d 305 (1983); we conclude that § 52-577a, although reenacted in 1979, must be applied retrospectively to actions such as the

---

[10] In its brief, the defendant curiously cites all three statutes as the "applicable statutes of limitations."

present one that accrued prior to the statute's effective date but were filed after the effective date. Additionally, we observe that not only is there an absence of "contrary legislative intent" that would prohibit retrospective application of this statute of limitations, the language of § 52-577a mandates its retrospective application. Subsection (g) provides that the section "shall apply to all product liability claims *brought* on or after October 1, 1979." (Emphasis added.) General Statutes § 52-577a (g).[11]

Because the trial court applied the statute of limitations provided in § 52-584, rather than § 52-577a, it is clear that the trial court committed error. We now must determine whether this constituted reversible error. We conclude that it did not.

Based upon the trial court's instruction that the statute of limitations was two years and the fact that the jury found the defendant liable, we deduce that the jury concluded that the plaintiff first knew or should have known that he was injured within two years prior to the initiation of the present action. Because of this, any error in applying this two year statute of limitations is rendered harmless as the proper statute of limita-

[11] Although at first glance it may seem anomalous to apply the product liability claim statute of limitations, General Statutes § 52-577a, retrospectively, but not apply the product liability act retrospectively, which is referred to in the statute of limitations for definitional purposes, we agree with the well reasoned opinion of Judge Dorsey in the United States District Court in which the District Court held that, notwithstanding the application of the statute of limitations as provided in § 52-577a, "there is no reason why after October 1, 1979, a complaint cannot be pleaded as a consolidated product liability claim thus embracing the negligence, strict tort and warranty claims ([General Statutes] § 52-572m [b]), while preserving and being controlled by the substantive law as it stood on September 30, 1979, if the action was based on facts which occurred on or before that date." *Collucci* v. *Sears, Roebuck & Co.*, 585 F. Sup. 529, 532 (D. Conn. 1984). The statutory language of the product liability act and § 52-577a, and our well settled law with regard to the retrospective application of legislation mandate this result.

tions, § 52-577a, provides for a longer limitation—three years. In other words, because the jury found that the plaintiff's action fell within the two year statute of limitations, it necessarily would have found that it satisfied the appropriate three year statute of limitations under § 52-577a. Thus, the defendant was not prejudiced by the trial court's error with regard to this claim.[12] Further, although the defendant introduced evidence that the decedent first knew or should have known of his asbestos related disease as early as 1975, in this case, we defer to the jury's determination on this question of fact and we will not disturb its finding. See generally *Zapolsky* v. *Sacks,* 191 Conn. 194, 198–201, 464 A.2d 30 (1983).

In arguing that all of the plaintiff's claims, both as administratrix and individually, are barred by the statute of limitations, the defendant also claims that the trial court erred in its instructions that allowed the jury to consider the plaintiff's claim for damages from the cancer, diagnosed in 1985, as separate and distinct from the claim for damages from the asbestosis. It appears to maintain here that the development of the decedent's cancer was not a separate and distinct injury but rather the logical and anticipated progression of his asbestosis that was known to or should have been known to the decedent in 1975, coupled with his smoking history. It further argues that the evidence lends support to this

[12] Additionally, the defendant's claim that the trial court erred by failing to advise the jury that the action had to be commenced within three years of the act or omission complained of under General Statutes § 52-584 is without merit because we have determined that that section is inapplicable. General Statutes § 52-577a, as it existed when this action was brought, provided that no product liability action could be brought against a party later than ten years from the date that the party parted with possession or control of the product. General Statutes (Rev. to 1981) § 52-577a (a). The jury could reasonably have found that the defendant supplied Electric Boat with asbestos-containing products until at least 1973 and that the decedent worked with those products until that time. Thus, since this case was instituted in 1980, the ten year limitation was satisfied.

claim. Thus, it is apparent that the defendant's claim here, simply put, is that the statute of limitations bars not only the asbestos claim but also the cancer claim and, therefore, all of the claims of the plaintiff, both as administratrix and individually, are barred and that the trial court erred in rejecting this position.

The plaintiff, on the other hand, points to evidence which she contends supports a conclusion that the asbestosis and the cancer were "two separate and distinct injuries and actionable harms." The statute of limitations, she argues, does not begin to run until the injured person suffers some form of actionable harm, citing *Catz* v. *Rubenstein,* 201 Conn. 39, 43, 513 A.2d 98 (1986). Insofar as the decedent's cancer is concerned, the plaintiff asserts that her decedent suffered no actionable harm until 1985 when the cancer was first diagnosed. Therefore, the trial court was correct, she argues, in instructing the jury that the claims for the asbestosis and the cancer were separate. She also argues that the defendant's contention that the statute of limitations barred her claims concerning the asbestosis *and* cancer and the resultant damages from it was properly rejected by the trial court by its jury instructions. The trial court, as we have already noted, submitted the issue of the statute of limitations to the jury for its determination and the jury resolved that issue against the defendant.

The trial court's action on this matter was not clearly erroneous. The defendant does not quarrel with the substance of the instructions but does contend that the instructions should not have been given and that a directed verdict should have been rendered because, as a matter of law, the trial court should have found that the plaintiff knew or should have known of the injuries in 1975. We already have rejected this claim as a question of fact properly to be resolved by the jury. Therefore, because the trial court did not commit

reversible error in refusing to set aside the jury's finding for the plaintiff on her claim related to asbestosis, the defendant's argument that the plaintiff's claim as it relates to the decedent's cancer is also barred by the statute of limitations must fail.

## III

The defendant also claims that the trial court erred in failing to direct a verdict and to render a judgment notwithstanding the verdict in its favor because there was insufficient evidence that the decedent was exposed to the defendant's products to support the verdict. We find no error on this claim.

"The test for determining the validity of the jury's verdict is whether the evidence, fairly and impartially considered, would be likely to induce in the minds of six persons of ordinary intelligence, attentively considering it and using common-sense logic, a reasonable belief that it is more probable than not that the facts in issue are true." *Rapuano* v. *Oder,* 181 Conn. 515, 517, 436 A.2d 21 (1980), citing *O'Brien* v. *Cordova,* 171 Conn. 303, 305, 370 A.2d 933 (1976); *LeBlanc* v. *Grillo,* 129 Conn. 378, 382, 28 A.2d 127 (1942). The jury's findings of fact will not be disturbed "if it is reasonably supported by the evidence or the reasonable inferences drawn from the facts proven." *Tragakiss* v. *Dowling,* 183 Conn. 72, 73, 438 A.2d 818 (1981). If there is conflicting evidence, it is up to the jury to decide which evidence to believe. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 524, 457 A.2d 656 (1983).

In support of this claim of error, the defendant asserts in its brief that "the quantity or amount of asbestos-containing products supplied to the decedent's employer by this defendant amounted to less than one percent of the total of such products utilized by the

decedent's employer." The defendant, however, provides us with no authority to substantiate this claim.

Our review of the record indicates that, at a minimum, the defendant sold to Electric Boat approximately $130,000 worth of products containing a very high percentage of asbestos. Although no witnesses specifically testified that they saw the decedent handle the defendant's products, the jury reasonably could have found or inferred that he was exposed to the defendant's products based on the work that he was engaged in, the length of time he was employed, and the fact that coworkers-who performed similar work testified that they handled the defendant's products. Because there was disputed evidence regarding the decedent's exposure, we will not substitute our judgment for that of the trial court and the jury. Thus, we find no error in the trial court's refusal to set aside the verdict and to render a judgment notwithstanding the verdict.

## IV

The defendant maintains that the verdicts on the first and third counts are excessive as a matter of law and must be set aside and/or reduced by the sums of money paid or agreed to be paid to or on behalf of the plaintiffs by third parties. We do not agree.

Before addressing the claim of excessiveness as to the first count, some preliminary matters merit discussion. Initially, we consider the plaintiff's claim on the cross appeal that, because the jury found on the second count that the plaintiff was entitled to recover punitive or exemplary damages against the defendant, that prevents the application of the law of "comparative responsibility" to both the first and third counts. In other words, with the jury verdict on the second count there cannot, she argues, as a matter of law, be any reduction factor for "comparative responsibility" on

either the first or third counts. We cannot accept this proposition for several reasons. First, the jury was not so charged and the plaintiff took no exception in that regard. This alone would dispose of this claim. Second, the plaintiff points to no request to charge in the record asking for such an instruction. Third, and significantly, in this case the parties "agreed" to the application of the doctrine of "comparative responsibility"[13] to this case.

[13] In its instructions to the jury, the trial court, on this phase of the matter, referred to "comparative negligence" and not "comparative responsibility." While taking the exceptions, the following colloquy took place between the court and plaintiff's counsel:

"Atty. Shafner: In regard to comparative negligence special defenses in terms of contributory negligence, Your Honor charged that comparative negligence in there, but there was no reference to the impact of the—fifty percent negligence finding would be and I thought Your Honor was going to charge . . . .

"The Court: My understanding—I charged that no amount of comparative negligence can defeat recovery in a products liability action under what I think is the law.

"Atty. Shafner: I'm not sure that's accurate, Your Honor, in a non-statutory products liability.

"The Court: That statute provides that—the legislative commissioner's office put the statute of limitations amendments into the products liability act, but in point of fact, those were in 19—whenever they were passed. The law applies to actions brought after 1977. Whether they're brought under the statute or not. That's—so I charged the way I did which I should think would be in your favor.

"Atty. Shafner: I think it probably was, Your Honor.

"The Court: But that's what I think, I recognize that we're saying this is a common law action and that we're not under the statute, but I think we are under the statute for purposes of the statute of limitations."

Despite the intermingling of the terms "contributory negligence," "comparative negligence" and "comparative responsibility" by both the trial court and the parties at trial and by the parties in their briefs in this court, for the purposes of this opinion we use the term "comparative responsibility." We have no quarrel, under the circumstances of this case, with the parties treating General Statutes § 52-572*l* as the functional equivalent of General Statutes § 52-572o. See generally R. Yules, "Defenses in a Connecticut Product Liability Case," 57 Conn. B.J. 441, 452 (1983). A logical explanation for the existence of the two similar statutes, i.e., §§ 52-572*l* and 52-572o, is that the latter applies to those actions that accrue after October 1, 1979, and the former applies to those actions pending or brought after June 7, 1977, but accruing no later than September 30, 1979.

Confining our discussion at this point to the first count, the instruction on the doctrine of "comparative responsibility" adequately informed the jury that it was to apply the doctrine to any sum of money as compensatory damages that it might, if it found for the plaintiff administratrix on that count, decide to award as to that count. In its verdict on that count, the jury found that "the 100 percent value of the Plaintiff's claim on [the] first count to be $144,673" and it further found the "Plaintiff to be 75 percent contributorily negligent and Plaintiff's net damages to be $36,168.25." In this case, § 52-572l provided that "contributory negligence or comparative negligence shall not be a bar to recovery." It was thus possible for the jury, as it did, to find that the decedent, Wilfred Champagne, was 75 percent negligent and still recover a verdict on the first count. It was also proper under the law, with this finding on the first count, for the jury to "diminish the award of *compensatory* damages proportionately," i.e., by 75 percent of the 100 percent value of the damages so found on that count. Our purpose in assessing damages for civil wrongs is to "compensate" a plaintiff for his injuries. *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 236, 477 A.2d 988 (1984); *Doroszka* v. *Lavine,* 111 Conn. 575, 578, 150 A. 692 (1930).

The occasion for awarding punitive[14] damages is quite different from that of awarding compensatory damages under our "long-standing rules governing the award of punitive damages." *Alaimo* v. *Royer,* 188 Conn. 36, 42, 448 A.2d 207 (1982). In *Alaimo,* we reiterated that rule: " 'Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional or wanton violation of those rights. . . . If awarded, they are restricted to cost of

[14] Because this cause accrued in 1978, we apply the law of punitive damages as it existed at that time. Cf. General Statutes § 52-240b.

litigation less taxable costs of the action . . . . ' " Id., quoting *Vandersluis* v. *Weil,* 176 Conn. 353, 358–59, 407 A.2d 982 (1978); *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* supra, 238; *Hall* v. *Smedley Co.,* 112 Conn. 115, 119–20, 151 A. 321 (1930). Moreover, punitive damages generally have the flavor of punishment against a defendant for the quality of his conduct and of deterrence to a defendant or others against such conduct in the future. See, e.g., W. Prosser, Torts (4th Ed. 1971) § 2, p. 9; D. Dobbs, Remedies (1973) § 3.9, pp. 204–205; Restatement (Second), Torts § 908, comment a (Tent. Draft No. 19, 1973); D. Owen, "Punitive Damages in Products Liability Litigation," 74 Mich. L. Rev. 1257 (1976). Such damages are, therefore, not doctrinally duplicative of compensatory damages, but rather serve "special, limited purposes other than compensation." D. Dobbs, supra, § 3.1, p. 135.

We perceive nothing conceptually or logically inappropriate in allowing, in a proper case such as this one, the allowance of both compensatory and punitive damages. We have only recently said that "[a]lthough the rule making actual damage an element of a cause of action in negligence may have originated in the common law distinction between trespass and trespass on the case, we are not inclined to obliterate the distinction between intentional and unintentional conduct in terms of legal consequences which it serves to implement. Where the plaintiff's right has been intentionally invaded, its vindication in a court of law and the award of nominal and even exemplary damages serves the policy of deterrence in a real sense." *Green* v. *Donroe,* 186 Conn. 265, 270–71 n.2, 440 A.2d 973 (1982). In like manner here, where there are two types of conduct of the defendant for which the law permits an award of damages, an award for each may be made. The very office each type of damage serves indicates

that they are not duplicative. The finding that punitive damages are to be awarded does not, from any vantage point of tort law, cognizable legal consequences or consideration of policy, mandate the exclusion of comparative responsibility in arriving at compensatory damages as the jury did on the first count. In any event, courts always apply rules of damages flexibly to assure justice. See *Zeliff* v. *Sabatino,* 15 N.J. 70, 75, 104 A.2d 54 (1954). There is no doubt that comparative responsibility is a crucial factor to be considered in determining compensatory damages. Because it is clear from our discussion that punitive damages and compensatory damages may both be assessed in a case where the predicate for punitive damages is found to exist, it is not inconsistent or illogical to apply the comparative responsibility in arriving at compensatory damages in a case where punitive damages are also assessed. Thus, there is no error on this aspect of the plaintiff's cross appeal.

In regard to the claim that the verdicts were excessive, the defendant claims that the trial court erred in denying its motion to set aside the verdicts, refusing to render judgment notwithstanding the verdict and denying its motion for remittitur in that the verdicts were excessive or, in the alternative, by reducing the same by the sum agreed to by the plaintiffs in settlement of identical claims against third parties. We do not agree that the trial court erred in denying the defendant's posttrial motions refusing to set aside the verdicts and to render judgment for the defendant notwithstanding the verdict or for a remittitur.[15]

---

[15] We find no memorandum of decision by the trial court on any of the posttrial motions filed by the parties setting out its reasoning for its action on these motions. Such a memorandum would have been helpful to appellate review in a complex case of this nature. See *Gigliotti* v. *United Illuminating Co.,* 151 Conn. 114, 124, 193 A.2d 718 (1963); *Lancaster* v. *Bank of New York,* 147 Conn. 566, 573, 164 A.2d 392 (1960); *Pischitto* v. *Waldron,* 147 Conn. 171, 174, 158 A.2d 168 (1960).

There is no dispute that prior to the trial of this case, the plaintiff "agreed" to settle her claim against other defendants for $190,000. In admitting this, the plaintiff refers to her affidavit presented to the trial court in this regard[16] and concedes in her brief that "[t]his sum includes the claims on behalf of the Estate as well as [the] plaintiff's individual claim for loss of consortium but [it] is not broken down as to the estate or the plaintiff individually." In resisting the defendant's claim here, the plaintiff maintains that neither she nor the estate has received any money from this "settlement," that no releases have been signed, that no probate approval of such "settlement" has been granted and that no written approval of the decedent's workers' compensation employer has been obtained. Therefore, she maintains that the events that would "trigger" the analysis of the verdicts, "which might have been augmented by prior settlements had not yet occurred at the time of trial" and there was, therefore, nothing for the trial court to consider pursuant to the rule announced in *Peck* v. *Jacquemin,* 196 Conn. 53, 63, 71, 491 A.2d 1043 (1985). The plaintiff goes on to argue that "[a]ssuming, arguendo, that the trial court

---

[16] The plaintiff's posttrial affidavit was as follows:

"AFFIDAVIT

1. I am CECELIA CHAMPAGNE and I am the plaintiff in this action.

2. In about January of 1987 as plaintiff I reached an agreement with several of the asbestos suppliers to settle her claims pending in the United States District Court for the District of Connecticut.

3. The total amount of the settlements agreed upon were $190,000. The agreement included undivided claims for the Estate, as well as my individual claims for loss of consortium. The separate claims were not broken down.

4. The agreements have not been executed to this date because written approval of the employer has not been obtained and filed with the Department of Labor, and the Probate Court for the District of Norwich has not yet approved any compromise of the claim.

5. The plaintiff has not executed any releases in favor of any asbestos suppliers to this date.

CECELIA CHAMPAGNE"

had considered the likelihood that [the] plaintiff would eventually receive the proceeds of the settlements previously agreed upon, its decision to refuse the defendant's motion for remittitur would nonetheless have been proper." She then proceeds to contend that nothing that the trial court did in denying the remittitur contravenes our interpretation of General Statutes § 52-216a[17] in *Peck* where we said, inter alia, that "[i]n making its postverdict determination on the issue of any claimed excessiveness or inadequacy, the trial court [is] directed to consider the amount of money paid to a plaintiff as the result of [a settlement with another tortfeasor]." *Peck* v. *Jacquemin,* supra, 71; see also *Alfano* v. *Insurance Center of Torrington,* 203 Conn. 607, 610, 525 A.2d 1338 (1987). The plaintiff argues that, under *Peck* and *Alfano,* the trial court can only consider the settlement amount *paid* together with the verdicts to determine excessiveness or inadequacy as a matter of law.

On the other hand, the defendant points to the $190,000 agreed upon and notes that the plaintiff is entitled only to one satisfaction of what the jury found proven to be just damages. *Sanders* v. *Officers Club*

---

[17] General Statutes § 52-216a provides: "READING OF AGREEMENTS OR RELEASES TO JURY PROHIBITED. ADJUSTMENTS FOR EXCESSIVE AND INADEQUATE VERDICTS PERMITTED. An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. If the court concludes that the verdict is inadequate as a matter of law, it shall order an additur, and upon failure of the party so ordered to add the amount ordered by the court, it shall set aside the verdict and order a new trial. This section shall not prohibit the introduction of such agreement or release in a trial to the court."

*of Connecticut, Inc.,* 196 Conn. 341, 354, 493 A.2d 184 (1985). It argues that, because the total verdicts on the first and third counts, i.e., $36,168.25 and $80,000, is less than the $190,000, then, as a matter of law, "the just damages found by [the] jury have been fully paid and satisfied and therefore any additional award would be excessive and a remittitur should have been ordered accordingly."

We agree that the trial court correctly denied the remittitur on the first count and that that verdict was not excessive as a matter of law. We so conclude for several reasons. First, the $190,000 is admittedly wholly unallocated so as to be amenable to any fair breakdown of that sum as between the first and third counts. We simply have no means of knowing what portion was intended or agreed, if that is so, to be in payment of compensatory damages to the estate of Wilfred Champagne as to the first count and what portion was likewise to be allocated to the third count, which is the claim of Cecelia Champagne individually for the loss of consortium. We do not find facts. See, e.g., *Riccio* v. *Abate,* 176 Conn. 415, 418, 407 A.2d 1005 (1979). Moreover, it is not our function to speculate on that "allocation." This reason alone is sufficient basis for us to let stand the trial court's decision not only on its denial of the defendant's claim on excessiveness and a remittitur but also on any claim of the plaintiff for an additur on the first count. Second, neither approval of the Norwich Probate Court nor written approval of the decedent's workers' compensation employer "has been obtained."[18] The plaintiff also has not received

[18] At oral argument, we were told that the workers' compensation employer has a lien against the award, but the amount of that lien was not indicated. The workers' compensation lien, we were also told, requires not only approval of the workers' compensation employer but also of the United States Department of Labor under federal law. At oral argument, we were also informed by plaintiff's counsel that while probate approval is expected, it has not yet been sought because of certain claims raised by the defend-

any money and releases have not been signed pursuant to this alleged "settlement." We also note that we cannot resolve the excessiveness issue because of our remand, as discussed below, of the third count. Because of this remand, we simply do not know at this time what the verdicts on the first and third counts will actually total and thus cannot determine whether the $190,000 "settlement" would make these verdicts excessive as the defendant claims.

## V

We turn now to the plaintiff's claim on her cross appeal that the trial court erred "in accepting the part of the jury verdict which reduced the damages by 75% because of contributory and/or comparative negligence[19] of the plaintiff." This is so, she argues, because "contributory negligence in products liability actions applies only to misconduct with the product itself and there was no evidence of contributory and/or comparative negligence on the part of the plaintiff in the use of the defendant's products." In addition, she contends that the trial court erroneously concluded, as a matter of law, that "cigarette smoking can constitute contributory and/or comparative negligence in regard to a products liability claim for asbestos disease" and that, in any event, the evidence of smoking was "insufficient to support the defense or allegation of comparative fault by the [plaintiff's] decedent."

ant in this case. These "claims" were never specified by the plaintiff and the defendant did not address this contention at oral argument. The lack of allocation of the proceeds of this "settlement" and the lack of its approval by the Probate Court and the workers' compensation employer effectively forecloses our resolution of this issue.

[19] This is another example of the lack of precision of the use of legal terms with special meanings that occurred not only in the briefs of the parties but also at the trial. This does not enhance clear presentation of certain matters for appellate review.

The defendant replies that, "in pretrial discussions," all parties agreed that "pure comparative responsibility" would be applicable to the plaintiff's claims. This is not the only reason, the defendant contends, that the plaintiff should now be unable to claim error as to the 75 percent "contributory and/or comparative negligence" that the verdicts attribute to the plaintiff's decedent. In addition, the defendant argues that the plaintiff took no exception to the jury instructions which allowed the jury to so find. As to the plaintiff's claim that the trial court erroneously concluded that cigarette smoking could constitute comparative responsibility in a claim of this nature, the defendant argues that the plaintiff took no exception to the trial court's instruction "relative to cigarette smoking as it may relate to comparative responsibility or proximate causation."[20]

The plaintiff's rejoinder is that there was no need for her to take an exception to the jury instructions on the law of comparative responsibility because the charge as given was correct. In responding to the defendant's argument that she took no exception to "the charge for comparative responsibility for cigarette smoking [by the plaintiff's decedent Wilfred Champagne]," she says there was "*no* charge made by the court as to cigarette smoking and its relationship to comparative responsibility and proximate causation and no exception could be taken . . . . " (Emphasis in original.) Therefore, she concludes, she has not "waived" any

[20] Here, in its brief, the defendant argues that prior to the jury charge, "it was agreed by plaintiff's counsel that the trial judge" would not specifically charge the jury as to how it may consider cigarette smoking as it may relate to comparative responsibility or proximate causation. The plaintiff also claims that plaintiff's counsel had raised this issue during a precharge conference with the trial judge, and that, after hearing the trial judge's proposed thoughts on that, plaintiff's counsel "withdrew any request that the court specifically address the issue." The discussions "prior to the jury charge" are also not on the record.

right to argue that "the court erred in accepting the jury's verdict which reduced the damage award by seventy-five (75%) percent."[21]

Although we agree with the defendant that the plaintiff took no exception to the court's instructions "relative to cigarette smoking as it may relate to comparative responsibility," we also agree with the plaintiff that there was no such charge to which she could have taken such an exception. We, however, reach the merits of the plaintiff's claim on a different theory.

The plaintiff had filed a request to charge on "[a] defendant takes a plaintiff as it finds him" theory, citing such applicable cases as *Thompson* v. *Lupone,* 135 Conn. 236, 62 A.2d 861 (1948), and *Flood* v. *Smith,* 126 Conn. 644, 647, 13 A.2d 677 (1940). The trial court did not give such an instruction and the plaintiff took an exception. Had the trial court given such an instruction, the jury could not have considered the smoking history of Wilfred Champagne and its sequellae on the issue of comparative responsibility. In the absence of such an instruction and in view of the mass of evidence of the decedent's smoking history and its sequellae, the jury could have, and indeed apparently did, consider that evidence on the issue of comparative responsibility. Therefore, the plaintiff's claim on cross appeal is properly before us and we will address it.

Despite any claims to the contrary, if one "agreement" is evident from the record, it is that the parties agreed that comparative responsibility was to apply.[22]

---

[21] As will be discussed, plaintiff's counsel also claims that the jury should not have applied the 75 percent discount factor to the damages on the third count for loss of consortium.

[22] In oral argument before this court, plaintiff's counsel, who was not the same attorney that tried the case in the trial court, said that it had been agreed that "pure comparative responsibility" would apply and he referred at that time to General Statutes § 52-572*l*.

Although the plaintiff argues that there was no agreement that it was to be applied to the third count, there is no exception by the plaintiff to the court's instructions, the fair reading of which does not indicate that comparative responsibility was not to apply to the third count. The plaintiff's "exception" concerning the comparative negligence instruction given clearly shows that the plaintiff acquiesced in the trial court's position that it had charged that "no amount of comparative negligence can defeat recovery in a products liability action under what [the court thought] was the law."[23]

We do not agree with the plaintiff insofar as she contends that comparative responsibility was not applicable to the first count because, as she says, in strict product liability cases comparative responsibility applies only to misuse by the plaintiff of the alleged

[23] We also note that, upon the conclusion of taking exceptions to its instructions, the trial court said: "Counsel, let's review the verdict forms and let's get the exhibits to the jury." At oral argument in this court, plaintiff's counsel agreed with defendant's counsel that "originally, [he] believed" the verdict forms were reviewed by counsel. While again not on the record, we were told at oral argument that at some later time on December 15, 1987, a problem developed when the jury reported its verdict in the third count. Apparently, the problem involved the issue of whether the jury, in the event of a plaintiff's verdict on the third count was required to award the plaintiff the same amount of damages as it might decide to award the plaintiff on the first count. This problem, however, had nothing to do with the fact that the verdict form in the third count still had originally gone to the jury with language permitting the jury to diminish an award for the plaintiff in the third count by the percentage of the "contributory responsibility" attributable to the decedent. We point out here, as we do in our discussion, infra, of the third count, that there is no transcript filed in this court of what transpired at the time that the verdicts on any of the counts were returned and ordered accepted and recorded on December 15, 1987. Similarly, there is no transcript filed in this court of the trial court proceedings on December 16, 1987, when the verdict on the third count was returned and accepted. "It is a plaintiff's burden to ensure that this court is provided with an adequate appellate record." *DeMilo* v. *West Haven*, 189 Conn. 671, 681, 458 A.2d 362 (1983); *State* v. *Woolcock*, 201 Conn. 605, 616–17, 518 A.2d 1377 (1986); *Taylor* v. *American Thread Co.*, 200 Conn. 108, 112, 509 A.2d 512 (1986).

defective product itself. This case was tried as a pre-1979 strict product liability case and was so presented to the jury under appropriate instructions by the court. The plaintiff took the benefit of jury instructions that clearly indicated that no amount of contributory and/or comparative negligence would bar the plaintiff's recovery on the first count. See General Statutes § 52-572*l*. The plaintiff also heard the trial court describe the possible verdicts during its instructions including those possible verdicts on the first count that provided for the jury to diminish a plaintiff's verdict on that count by the percentage of the negligence of the decedent. The plaintiff took no exception to that explanation even though the trial court had not instructed the jury at all on the plaintiff's decedent's misuse of the allegedly defective product. The trial court's instructions were correct.

Under § 52-572*l*, "[i]n causes of action based on strict tort liability, contributory negligence or comparative negligence shall not be a bar to recovery."[24] Therefore, while neither of these doctrines operate as "a bar to recovery," i.e., prohibit a plaintiff from prevailing on the issue of liability, this statute does permit a jury to diminish a plaintiff's dollar verdict by that percentage of his own responsibility in such actions even where it may be found to exceed that percentage of negligence which would, under the doctrine of comparative negligence, operate as a bar to a plaintiff's recovery. See General Statutes § 52-572h (b). In purpose and in effect, § 52-572*l* clearly permits pure comparative responsibility that later was explicitly set out in § 52-572o.

[24] The noun "recovery" has been defined to mean "to be successful in a suit . . . to obtain . . . a judgment." Black's Law Dictionary (4th Ed. 1951); see *Garza* v. *Chicago Health Clubs, Inc.*, 347 F. Sup. 955, 962 (N.D. Ill. 1972). "Recover," in the context of the phrase "recover damages," has been said to be " 'the winning back of losses incurred from injury.' " *Aetna Ins. Co.* v. *Colbert*, 37 Conn. Sup. 794, 795, 437 A.2d 143 (1981).

Having determined that comparative responsibility is applicable in a common law product liability case such as this, we now must determine whether smoking can be considered in determining comparative responsibility. We conclude that there is no reason to prohibit the use of one's smoking history in determining comparative responsibility in this case involving asbestosis. See generally *Brisboy* v. *Fibreboard Corporation,* 429 Mich. 540, 418 N.W.2d 650 (1988). The trial court, therefore, did not abuse its discretion in submitting the issue of smoking to the jury to be considered in its determination of the matter of the decedent's comparative responsibility.

The trial court's instructions concerning the comparative responsibility of the plaintiff's decedent correctly informed the jury of the standards to be used in assessing the conduct of Wilfred Champagne. Without repeating it in its entirety here, the court said in part: "Comparative negligence is conduct which involves an undue risk of harm to the person who sustains it. . . . In determining whether the plaintiff is guilty of comparative negligence, when I said the plaintiff, I mean Mr. Champagne, in this case, in determining whether Mr. Champagne is guilty of comparative negligence you must consider whether Mr. Champagne failed to exercise that degree of care for his own safety that a reasonable person would have exercised . . . and as a result, contributed to the injuries which he sustained, you may diminish any award of damages to the plaintiff proportionately according to the measure of damages attributable to Mr. Champagne's conduct."

The instructions concerning the standard to be used in assessing Wilfred Champagne's conduct were broad and it is correct that they did not mention the decedent's cigarette smoking history. Our examination of the trial transcripts, the exhibits and the arguments of the parties in the briefs leaves no question, however,

that that history played a crucial part in the trial and was intended to do so by the parties and permitted by the trial court.

"In reviewing the evidence . . . we must give it the most favorable construction in support of the verdict of which it is reasonably capable." *Healy* v. *White*, 173 Conn. 438, 442, 378 A.2d 540 (1977), quoted in *Shelnitz* v. *Greenberg*, 200 Conn. 58, 67, 509 A.2d 1023 (1986). The trial court's action, in refusing to set aside a verdict, cannot be reviewed in a vacuum because such a motion seeks to deprive "a litigant in whose favor a verdict has been rendered of his constitutional right to have disputed issues of fact determined by a jury . . . . " *Jacobs* v. *Goodspeed*, 180 Conn. 415, 417, 429 A.2d 915 (1980). This requires the examination of the evidential underpinnings of the verdict. " 'Upon issues regarding which, on the evidence, there is room for reasonable difference of opinion among fair-minded men, the conclusion of a jury, if one at which honest men acting fairly and intelligently might arrive reasonably, must stand, even though the opinion of the trial court and this court be that a different result should have been reached.' *Horvath* v. *Tontini*, 126 Conn. 462, 464, 11 A.2d 846 (1940)." Id. It is the province of the jury to determine the credibility and the weight to be given the evidence. *Gallo* v. *Gallo*, 184 Conn. 36, 38, 440 A.2d 782 (1981); *Angelica* v. *Fernandes*, 174 Conn. 534, 535, 391 A.2d 167 (1978). Where "jurors [are] confronted with conflicting evidence . . . the choice of the more credible evidence [is] for them to make." *State* v. *Arnold*, 201 Conn. 276, 284, 514 A.2d 330 (1986). The jury decides questions of fact. *Gaulton* v. *Reno Paint & Wallpaper Co.*, 177 Conn. 121, 127, 412 A.2d 311 (1979). In its consideration of the evidence, it is the jury's right to draw logical deductions and make reasonable inferences from facts found proven. *State* v. *Gabriel*, 192 Conn. 405, 421, 473 A.2d 300 (1984); *Dacey*

v. *Connecticut Bar Assn.,* 170 Conn. 520, 540, 368 A.2d 125 (1976); *Johnson* v. *Flammia,* 169 Conn. 491, 496, 363 A.2d 1048 (1975). " 'In weighing the testimony of an expert, the trier of fact may accept part of the testimony of an expert without being bound by all of the opinion of the expert.' " *Johnson* v. *Healy,* 183 Conn. 514, 517, 440 A.2d 765 (1981), quoting *United Aircraft Corporation* v. *International Assn. of Machinists,* 169 Conn. 473, 490, 363 A.2d 1068 (1975), cert. denied, 425 U.S. 973, 96 S. Ct. 2172, 48 L. Ed. 2d 797 (1976). " '[The] [a]ssessment of damages is peculiarly within the province of the jury . . . . ' *Slabinski* v. *Dix,* 138 Conn. 625, 629, 88 A.2d 115 (1952)." *Fox* v. *Mason,* 189 Conn. 484, 489, 456 A.2d 1196 (1983). Moreover, "[j]urors are not 'expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct.' (Citations omitted.)" *Frankovitch* v. *Burton,* 185 Conn. 14, 22, 440 A.2d 254 (1981); *State* v. *Scielzo,* 190 Conn. 191, 198–99, 460 A.2d 951 (1983).

To put this matter of the decedent's smoking history into context, we refer to certain of that evidence.[25] Wilfred Champagne was born on December 1, 1924, and he died on May 3, 1985. He worked at Electric Boat from 1959 to 1979. During the later years of his life he had given varying information to various persons concerning his cigarette smoking history. In 1975, he

[25] Wilfred Champagne's smoking history was initially brought to the jury's attention during the opening statements of the attorneys. While this is not evidence, we note that the transcript discloses that the plaintiff's attorney at that time said that Champagne had been a cigarette smoker for nineteen to twenty years before 1978. At that time, the defendant's attorney told the jury that they would hear evidence about long-term smoking, a couple of packs a day, and that they would hear evidence about the "development of emphysema, followed by or simultaneous with the development of bronchitis and then ultimately lung cancer."

told one doctor, Dr. Raphael S. Pascual, that he had been smoking three packages of cigarettes per day for fifteen years.

In July, 1975, medical tests were conducted on a number of Electric Boat employees, including Champagne, at Groton, under the auspices of the Mount Sinai School of Medicine of New York City, and particularly under the supervision of Dr. Irving J. Selikoff, an acknowledged authority on asbestosis. On October 23, 1975, in a letter to Wilfred Champagne, Selikoff informed him that "[s]ome changes were found in [Champagne's] chest x-ray" and that it was advisable for him to "discuss these with [his] personal physician so that adequate follow-up may be planned."[26] More to the point, Selikoff also stated: "It is strongly advised that you discontinue cigarette smoking."[27] Under "History" the Selikoff report notes: "Smoking–Began age 18; 10–20/day; current smoker."

In 1978, Champagne participated in a chest survey at Electric Boat. In a letter to him, dated September 25, 1978, Dr. Edward A. Gaensler of the Boston University Medical Center informed him: "Your chest x-ray and some of your breathing tests indicate that you have a moderate degree of asbestosis. We have reviewed your x-rays in the past and these changes were present in the 1976 film and have showed no marked change. We also notice that you have continued smoking and since you reported some cough and sputum production, we urge that you stop because this may improve these

[26] The plaintiff has not pointed to, nor can we find, evidence of any such discussion with the decedent's own Connecticut physician.

[27] Selikoff's letter of October 23, 1975, under the heading "Laboratory Findings–Chest X-ray," notes: "Marked increase in profusion of irregular small opacities, middle and lower lung field bilaterally: pleural thickening bilaterally."

Under the heading "Special Symptoms—Respiratory," 'Chronic bronchitis" is written.

symptoms." A 1979 chest survey at Electric Boat notes: "Asbestosis, moderate" and "Emphysema." Under "Smoking History" which is checked "Yes" it indicates "Time 20 yrs; Pkgs per day 1." The words "Man given copy" appears in handwriting at the bottom of this document.

Wilfred Champagne received another letter from the Mount Sinai Medical Center in New York City, dated September 26, 1980, together with the results of "the physical examination, laboratory tests, pulmonary function tests, and x-rays" arising out of Champagne's recent visit to that facility. The conclusion in that letter stated in part: "—Asbestosis: interstitial pulmonary fibrosis and bilateral pleural fibrosis . . . Obstructive pulmonary dysfunction. . . . " The "Recommendations" included: "It is strongly recommended that the patient discontinue smoking."[28]

In November, 1980, Dr. Richard C. Pembrook, a physician who examined Champagne on behalf of a third party to determine whether he was disabled from job-related asbestosis, concluded that he did have "pulmonary asbestosis which is probably work related" and that he had "the typical changes of asbestosis on chest x-ray." In addition, this physician said that Champagne's "chief pulmonary disease is the presence of pulmonary emphysema" which was not "work related" and that "pulmonary function testing is consistent with the conclusion that pulmonary emphysema is by far and away his most important lung disease."

Dr. Nagi Kamireddy, who examined Champagne on April 1, 1985, at the Backus Hospital in Norwich, testified at the trial. He was a physician at that hospital who works in pulmonary and internal medicine. He had

---

[28] In this Mount Sinai report, the category "Smoking History" states: "He started smoking at age 17 and smoked 20–30 cigarettes per day. He has stopped smoking since February 1980."

never examined him before that and he never saw him again after that. The Backus Hospital record notes that Champagne "smokes" one pack per day. On cross-examination, Kamireddy was asked whether, when he saw Champagne, he "had a report from other physicians and records from other physicians as part of your [Kamireddy's] file." He answered: "When I saw him, we didn't have anything . . . [a]t that time except the patient."[29] As a result of his examination, he diagnosed a lung cancer. Champagne's death certificate listed squamous carcinoma of the right middle lobe and right lower lobe as the cause of death. When asked on direct examination if that cause was "a natural progression of the disease for which you treated him or had seen him earlier on April 1st, 1985," he answered: "That is the consequence of the disease." During his testimony, when asked if he had any question "where the primary, the original source of this cancer was that you [Kamireddy] found in his lung," he answered: "The primary is the lung," and he had no question about that. Earlier, in answer to a hypothetical question[30] on direct examination, when asked about the cause of Champagne's cancer, his answer was: "Most likely the cause of his cancer was asbestos exposure along with the incidence of smoking." In giving his reason for that, he said that the incidence of cancer in smokers exposed to asbestos is from ten to sixty times more than the incidence of cancer in nonsmokers exposed to asbestos.

Kamireddy also stated that when smoke enters the lungs, it can cause emphysema and chronic bronchitis;

[29] Upon further inquiry, Kamireddy testified that he had received medical records and some reports since that time from plaintiff's counsel.

[30] The hypothetical question was: "I want you to assume for now that Mr. Champagne was an asbestos worker at Electric Boat from 1959 to 1975. During that time he worked with asbestos products and he was a smoker for many years as you described. Do you have an opinion as to what was the cause of Mr. Champagne's lung cancer? With reasonable medical certainty."

both come "[m]ostly from smoking." He also discussed the mucous ciliary system in the bronchial tubes which are "like a hairy like thing, like a brush" which "usually sweeps away the mucous that [comes] out of the lungs." But "when you smoke," he said, "that normal structure is destroyed and they get more secretion in the bronchial tubes . . . . [T]he mucous ciliary system . . . can be destroyed by the [many] pollutants or smoking or anything, a lot of other things." Where these "brush like things in [a person's] airways [are] destroyed from cigarette smoking, or any other reason," in a person breathing in asbestos fibers, "[t]hat prevents the elimination of the asbestos fibers when you inhale." Although Kamireddy "[did] not have proof, [he thought] . . . Champagne had chronic obstructive pulmonary disease" which is a "chronic disease obstructing the airways which is the bronchial tubes . . . . " That disease, he testified, included three conditions: emphysema, bronchitis and asthma. Champagne did not have asthma. A CAT scan performed on Champagne in April, 1985, was "suggestive of emphysema," said this witness. But insofar as that being sufficient to make a diagnosis of emphysema, Kamireddy opined that "you need some test like pulmonary function test to support the diagnosis" and this could not be done in April, 1985, because of Champagne's clinical condition. Also in April, 1985, according to the medical records of a state health care institution, Champagne told a physician there that he started smoking at the age of eighteen or nineteen, about one pack per day, that he had reduced his smoking to about one half pack per day, but that he "continues to smoke."

The decedent's wife testified that he smoked "[m]ildly, very mildly," and that he smoked at least "to some extent" after their marriage in 1948. She vaguely recalls the decedent telling her at one point

that he had emphysema.[31] His daughter said that her father would light up a cigarette after dinner, and at different times she saw him smoking a cigarette as he watched television.

All of the evidence we have set out on the decedent's smoking, and more, was properly before the jury. The jury, by its verdict for the plaintiff administratrix on the first count, had already fastened liability upon the defendant. Having found liability, the jury turned to the issue of damages. On that matter, it had been instructed on the law of comparative responsibility that it was to apply to the conduct of Wilfred Champagne, including its right to "diminish such damages, according to the measure of responsibility attributable to [Wilfred Champagne]." It is correct that the trial court's instruction did not even mention the word "smoking" or, for that matter, "cigarettes." There can, however, simply be no question that this issue was clearly in the case and could properly be considered by the jury on the issue of the decedent's conduct vis-a-vis damages. Both parties vigorously pressed the issue of his cigarette smoking to advance their respective contentions. The jury was also instructed that, in considering Champagne's comparative negligence, "you must consider whether Mr. Champagne failed to exercise that degree of care for his own safety as a reasonable person would have exercised under the circumstances." It is hardly consonant with common sense to say that the jury, with the law it was given and the evidence before it, could not properly consider, in their province as the finders of fact, Champagne's smoking history over his lifetime, including specifically its relation to his asbestosis, in diminishing his damages according to the measure of responsibility attributable to him. It was a question of fact for the jury to

[31] She placed this at about the time of the Mount Sinai School of Medicine letter to the decedent of October, 1975.

decide whether he comported himself as a "reasonable person" knowing what he knew or should have known. It was not error for the trial court to allow the jury to consider it; the court had no motion to exclude such evidence from its consideration. Even if it did, it would not have been in error to permit the jury to consider it on the issue of the decedent's comparative responsibility. Jurors do not decide questions of fact in a vacuum; they are entitled to use their common sense and their observation and experience of the affairs of life. The jury had the benefit of expert and lay testimony concerning Wilfred Champagne's asbestosis, his cancer, his smoking history and his physical condition. It could reasonably conclude on the evidence that Wilfred Champagne's conduct, especially as concerns his smoking history vis-a-vis his asbestosis, was such that he knew, or as a reasonable man under the circumstances should have known, that his conduct was not reasonable. We are not at all persuaded that we should disturb the 75 percent diminution factor that the jury found on the first count. We will not, as the trial judge did not, disturb the verdict on the first count.[32]

## VI

The defendant next claims that the trial court erred in denying its motion to set aside the verdict on the

---

[32] In her preliminary statement of issues on cross appeal, the plaintiff expressed her intention to present the following issue: "1. Notwithstanding the unrefuted evidence of lost earnings, medical and funeral expenses of $210,000.00 of the plaintiff and evidence of his pain, suffering and death, did the trial court err in denying plaintiff's motion for an additur in that the jury verdict as to Count One of $116,000.00 was inadequate as a matter of law." In her brief, however, the only mention of lost earnings and funeral and medical bills occurs in her counter statement of facts. There is no argument on the claim submitted in the preliminary statement. Thus, we deem that claim abandoned. *Bialowans* v. *Minor,* 209 Conn. 212, 213 n.1, 550 A.2d 637 (1988); *Eamiello* v. *Liberty Mobile Home Sales, Inc.,* 208

third count and refusing to render judgment notwithstanding the verdict on the third count claiming the loss of consortium.[33] This, it contends, must be done

Conn. 620, 625 n.5, 546 A.2d 805 (1988), appeal dismissed,    U.S.    , 109 S. Ct. 1104, 103 L. Ed. 2d 169 (1989); *Hayes* v. *Smith,* 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984).

[33] The jury verdict on the third count for loss of consortium was returned and accepted on December 16, 1987, the day following the return and acceptance of the verdicts on the first and second counts. This has troublesome aspects in making for appropriate appellate review. First, we are informed at oral argument and in the defendant's brief that late in the day of December 15, 1987, the jury returned plaintiff's verdicts on all three counts. The defendant's brief recites that in the plaintiff's verdict on the third count, returned on December 15, 1987, the jury found "the 100 percent value of said damages to be $144,673.00 which it then reduced by 80 percent representing the comparative negligence of Wilfred Champagne, rendering a verdict in favor of Cecelia Champagne individually in the amount of $28,934.60."

We are then also informed, through oral argument and the defendant's brief, that on December 15, 1987, a mistake was noted concerning the verdict form, that everyone "agreed" that it should be remedied. As a result of this, we are then told that on the following morning, December 16, 1987, the trial judge "vacated his prior acceptance and recording of the jury verdict on the third count, charged the jury as to loss of consortium generally, including comments upon the percentage of comparative [sic] negligence applicable to the third count, [and] provided the jury with a new, corrected verdict form and sent them back to deliberate. After approximately one hour of deliberations, the jury returned a verdict on the third count in favor of Cecelia Champagne, individually, finding the 100 percent value of her loss of consortium claim to be $320,000.00, which it then reduced by 75 percent comparative [sic] negligence, resulting in a verdict on [the third] count in the amount of $80,000.00. This verdict was accepted and recorded by the [trial court] and the jury discharged."

None of the above is a matter of record. Especially, there are no transcripts of the doings of the afternoon of December 15, 1987, and the morning of December 16, 1987. This void, including what the parties "agreed" to concerning the jury verdict on the third count and the jury instructions on the following morning, is another example of how counsel have not presented us with an adequate appellate record; *DeMilo* v. *West Haven,* 189 Conn. 671, 681, 458 A.2d 362 (1983); that supports a party's claim of error on appeal. *State* v. *Woolcock,* 201 Conn. 605, 616–17, 518 A.2d 1377 (1986); *Taylor* v. *American Thread Co.,* 200 Conn. 108, 112, 509 A.2d 512 (1986). Particularly is this so concerning the increase in the jury verdict on the third count from $144,673 to $320,000.

as a matter of law because the evidence was insufficient to justify submitting this issue to the jury. Its fallback argument here is that if we resolve the sufficiency of evidence claim against it as to the third count, then the verdict on the third count must be set aside as being excessive. We discuss these claims seriatim.

With reference to the defendant's claim that the evidence on the loss of consortium is insufficient, we do not agree with the defendant. The term "consortium" is usually defined as encompassing the services and/or the financial support of a spouse, "and the variety of intangible relations which exist between spouses *living together in marriage.*" (Emphasis added.) *Hopson* v. *St. Mary's Hospital,* 176 Conn. 485, 487, 408 A.2d 260 (1979); *Kuhn* v. *Bridgeport Ambulance Service,* 11 Conn. App. 179, 182, 526 A.2d 11 (1987). In *Hopson,* we said that "[t]hese intangible elements are generally described in terms of 'affection, society, companionship and sexual relations.' " *Hopson* v. *St. Mary's Hospital,* supra. We have earlier referred to some of the evidence at the trial on this issue and in our review of the trial court's action we view the evidence in the light most favorable to the plaintiff. *Boehm* v. *Kish,* 201 Conn. 385, 388, 517 A.2d 624 (1986); *Pinto* v. *Spigner,* 163 Conn. 191, 192–93, 302 A.2d 266 (1972).

The evidence on this issue was sharply in conflict, but viewing it in the light most favorable to the plaintiff, while such evidence was hardly robust, it was, nevertheless, sufficiently legally viable to permit submission of the issue to the jury. This issue was seriously contested, particularly in view of the evidence that the decedent and the plaintiff did not live together on a continuing basis from 1979 until his death in 1985. The evidence on this issue viewed most favorably to the plaintiff was as follows: The plaintiff and the decedent had married in 1948 and at the time of the trial there were three living daughters of that marriage who were

aged thirty-eight, thirty and twenty-nine. At the time of trial, the plaintiff herself was employed at Electric Boat, having worked there since 1975. They had owned their own home since 1964 and the decedent "did everything" around the house, including the wiring, painting, certain plumbing and maintaining the cars. He particularly enjoyed singing and playing the guitar and taught others to play. They had many friends and they would visit back and forth, including summer trips to Maine. The decedent stopped working at Electric Boat in 1979. The plaintiff did not know that the decedent had asbestosis until September, 1978, and she noted that "he couldn't get his breath" and had "trouble falling asleep." About 1979, he moved away from the house "from time to time"; on occasion he came home, otherwise "he stayed over [at some friends'] house." This happened "more and more" and when he returned from "time to time," he would "do minor things [around the house], not big things as he did before." He was "slowing up . . . getting very tired and . . . couldn't move around fast." She continued working at Electric Boat. When he came home "from time to time," he stayed with her "[b]efore he got real sick." On these occasions, he would stay with her "[a] week, sometimes more, sometimes in and out." She said that during these periods, they would "live together as husband and wife . . . all the time."[34] The plaintiff and the defendant introduced evidence indicating that the decedent received mail at 52 Carver Avenue and 13 Marjorie Street, respectively.

---

[34] One of the daughters of the decedent and the plaintiff also testified concerning her father's activities, including his guitar playing and singing, and stated that "he was a very active man." From 1975 to 1985, she lived outside Connecticut but visited her parents on vacation as "we [usually] had a week's vacation." "The last couple of years [she] came up, [her father] hardly sang at all" and he told her that "he just couldn't get his breath to sing . . . . "

We have only recently said: " '[The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that they or some of them were influenced by prejudice, corruption or partiality.' *Burr* v. *Harty*, 75 Conn. 127, 129, 52 A. 724 (1902)." *Palomba* v. *Gray*, 208 Conn. 21, 24, 543 A.2d 1331 (1988). Moreover, "[i]t is not for us . . . to say what portions of the evidence should or should not have been believed by the jury in this case, but we are bound rather to decide whether the verdict was sound upon any reasonable and fair interpretation of the evidence." *Canfield* v. *Sheketoff*, 104 Conn. 28, 30, 132 A. 401 (1926); *DeLahunta* v. *Waterbury*, 134 Conn. 630, 637, 59 A.2d 800 (1948); *Caldwell* v. *Danforth*, 124 Conn. 468, 471, 200 A. 577 (1938). Thus, in view of the evidence, this issue was properly submitted to the jury.

Before we reach the specific issue of excessiveness on the third count, we must first resolve a claim made by the plaintiff on her cross appeal related to the consortium issue. The plaintiff argues that, because the jury verdict on the second count found that she was entitled to recover punitive or exemplary damages, that prevents the diminution of the verdict on the third count by the comparative responsibility of the decedent. We do not agree. Based on our earlier discussion, it is clear that there is no inconsistency in assessing comparative responsibility when there has been an award of punitive damages. We see no logical or conceptual distinction between the application of comparative responsibility to a consortium action and its underlying predicate action even where there has been an award of punitive damages. Analytically, the deriva-

tive action is dependent upon the legal existence of the predicate action, i.e., that action which can be brought on behalf of the injured spouse himself or herself. Conceptually and logically, it follows from that that the derivative action cannot afford greater relief liability-wise than would be permitted under the predicate action. Where the injured spouse is found negligent in the predicate action, that spouse is proscribed from recovering damages to the extent of such negligence. In like manner, the spouse bringing the derivative consortium action is proscribed from recovering damages to the extent of the injured spouse's negligence. Therefore, even though a spouse bringing a consortium action may be awarded punitive damages, that in no manner precludes the recovery of compensatory damages in that action from being diminished in proportion to the negligence of the spouse in the predicate action.

We now take up the defendant's claim that the verdict on the third count is excessive as a matter of law. We agree with the defendant. The claim that the amount of a verdict is excessive raises a question of law and not of fact. *Vandersluis* v. *Weil,* 176 Conn. 353, 358, 407 A.2d 982 (1978). "When the amount of damages awarded is at issue, the relevant inquiry is whether the verdict falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion that it was due to partiality, prejudice or mistake." *O'Brien* v. *Seyer,* 183 Conn. 199, 208, 439 A.2d 292 (1981); *Tomczuk* v. *Alvarez,* 184 Conn. 182, 187, 439 A.2d 935 (1981); *Gorczyca* v. *New York, N.H. & H. R. Co.,* 141 Conn. 701, 703, 109 A.2d 589 (1954). Stated another way: " 'The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion

that the jury were influenced by partiality, prejudice, mistake or corruption.' *Birgel* v. *Heintz,* 163 Conn. 23, 28, 301 A.2d 249 (1972) . . . ." *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 343, 430 A.2d 1 (1980). We are aware that, on appeal, we are limited to determining whether the trial court abused its discretion in denying the motion to set aside the verdict. Moreover, its decision "can be disturbed only by considerations of the most persuasive character, as where the verdict shocks the sense of justice or the mind is convinced that it is in fact entirely disproportionate to the injury. [W. Maltbie,] Conn. App. Proc., p. 151." *Mulcahy* v. *Larson,* 130 Conn. 112, 114, 32 A.2d 161 (1943); *Birgel* v. *Heintz,* supra, 26; *Zarrelli* v. *Barnum Festival Society, Inc.,* 6 Conn. App. 322, 327, 505 A.2d 25, cert. denied, 200 Conn. 801, 509 A.2d 516 (1986). This case is one of such "persuasive character."

Even viewing the evidence on this issue most favorably to sustaining the verdict as to damages and extending the appropriate deference to the trial court's action, we must conclude that it is excessive as a matter of law in that it "shocks [our] sense of justice" and that the trial court erred in denying that claim of the defendant. The evidence of the loss of consortium is sparse, especially when viewed in the time frame that it is suggested to encompass, i.e., from the time the decedent knew or should have known of his injury in 1978 until his death in 1985. Taking the evidence in the light most favorable to the plaintiff, the decedent left the home shortly after he learned of his illness in 1979. His return to their Norwich residence after leaving it and over the years to the time of his death "from time to time . . . [b]efore he got real sick" furnishes a minimal referent as to the frequency of his return to the family home. What the plaintiff wife meant by "[b]efore he got real sick" was not explicated even as to the year or years

to which she referred. This implicates the incidence, both as to time and frequency, of those occasions on which he stayed with her "[a] week, sometimes more, sometimes in and out." Yet, she did say that during these periods they would live together as husband and wife "all the time." See *Hopson* v. *St. Mary's Hospital,* supra, 487 (saying "consortium" refers to the relationship "which exist[s] between spouses living together in marriage"). The decedent still did "minor things" around the house, "not big things as he did before." Accepting this as true, the quality and quantity of this aspect of her consortium was also sparse. We have suggested that "consortium" includes the financial support of the spouse. See id. There was some evidence that, at least for some parts of the period from 1979 to 1985, the decedent was employed, albeit apparently for much lower wages than at Electric Boat and for a shorter work week. Yet, there is no evidence from the plaintiff, who herself worked throughout this period, on the consortium issue that she was in financial difficulty[35] insofar as that was attributable to the decedent. Such considerations as these convince us that the $320,000 figure of the 100 percent value that the jury placed on the loss of consortium is excessive as a matter of law.[36]

[35] The only evidence that could even remotely touch on this issue was that she said that she went to work at Electric Boat in 1976 at about which time they had just taken out a $9000 loan for steel siding on their Norwich home. Her working would be helpful "because if he was sick and took off," the loan payments still had to be made. This, of course, was, on the best of the evidence, two or three years before the decedent initially left to stay with "friends."

[36] In connection with the new trial we order on the third count, we note that, in the first count of the amended complaint that is brought on behalf of the estate of Wilfred Champagne, paragraph 16 (e) alleges that as a result of his asbestos exposure "his estate and his wife incurred large medical expenses for his care and treatment." We also note that in the third count of the amended complaint that is brought by Cecelia Champagne, individually, for loss of consortium, paragraph 25 of that count alleges that "[a]s a further result of the wrongful acts of the defendant corporation, the plain-

## VII

We turn now to the second count which is the trial court's determination of the amount of punitive damages to be awarded after the jury decided that such damages should be awarded.[37] The trial court awarded the plaintiff a total of $42,835.52 on the second count. In so doing, it followed the agreement of counsel and the rule of such cases as *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 237–38, 477 A.2d 988 (1984), limiting such damages to the cost of litigation less taxable costs. The trial court computed the award by taking one third of the verdicts on the first and third counts in accord with the contingent fee agreement that plaintiff's counsel had with the plaintiff. That figure came to $38,335.52, to which it added costs of disbursements of $4500, making for a total award of $42,835.52.

The defendant claims that the trial court erred in refusing to set aside the verdict for punitive damages on the second count and to render judgment notwith-

tiff, CECELIA CHAMPAGNE, together with her husband's estate, incurred medical expenses for the medical care and treatment of WILFRED [CHAMPAGNE] . . . ." This apparent overlap should be eliminated on the new trial even though the new trial is only ordered on the third count.

[37] The verdict form on the second count as returned by the jury accepted by the court was the following:

### "PLAINTIFF'S VERDICT ON SECOND COUNT

In this case the Jury finds the issues for the Plaintiff Cecelia Champagne, Administratrix, as against the Defendant Raybestos-Manhattan, Inc. on the second count, in that she is entitled to recover punitive or exemplary damages, to be set by the Court.

P. R. Marblo
Foreperson

N.B. Foreperson must sign name in ink.

Ordered, accepted and recorded.
Koletsky, J.
12/15/87
4:45 P.M."

standing the verdict on that count. In arguing that punitive damages are "inappropriate in multi-plaintiff litigations such as this," it relies heavily on Judge Friendly's opinion in *Roginsky* v. *Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967). *Roginsky* was an action to recover compensatory and punitive damages for personal injuries, primarily cataracts, from taking a drug, MER/29, developed by the defendant manufacturer for lowering blood cholesterol levels. *Roginsky* was the first case to be tried of seventy-five similar cases then pending in the District Court for the Southern District of New York. Several similar actions had been filed when *Roginsky* was decided. In that case, Judge Friendly discussed punitive damages at length, especially in the multiplaintiff party context, saying in part: "The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering. . . . We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill." Id., 839.

Initially, we note that Judge Friendly's concerns about the consequences of awarding punitive damages were dicta and not holding. It is true that *Roginsky* affirmed the District Court's judgment as to compensatory damages and reversed it as to its judgment for punitive damages. In *Roginsky,* Judge Friendly's "confessed dictum"; *Moran* v. *Johns-Manville Sales Corporation,* 691 F.2d 811, 817 (6th Cir. 1982); specifically noted that "the New York cases afford no basis for our predicting that the [New York] Court of Appeals would adopt a rule disallowing punitive damages in a case such as this . . . . " *Roginsky* v. *Richardson-Merrell, Inc.,* supra, 841. The basis, however, for its holding was that the evidence was insufficient under New York law for an award of punitive damages. Judge Friendly's statements concerning punitive damages opined what the

New York Court of Appeals might do if confronted by the issue in a strict product liability context, but his statements were still dicta. In addition, it is significant to observe that *Roginsky's* dicta were not enunciated in a case involving strict product liability but rather in fraud and negligence. Id., 832. The suasion of the *dicta* of *Roginsky,* given its posture, is not convincing.[38]

We, nevertheless, recognize the problems that may arise with awards of punitive damages in multiplaintiff product liability situations. See D. Owen, "Problems in Assessing Punitive Damages against Manufacturers of Defective Products," 49 U. Chi. L. Rev. 1 (1982). We are not convinced, however, that in this case they are such as to bar punitive damages. Initially, based on the record, we note that there is a question whether the case before us is truly one of the multiplaintiff type of case that the defendant suggests. In any event, "[w]hile punitive damages may not be a logically perfect method of remedying . . . perhaps unavoidable flaws in our system of justice, they are a useful surrogate not necessarily precluded by a strict products liability regime." *Acosta* v. *Honda Motor Co., Ltd.,* 717 F.2d 828, 837 (3d Cir. 1983); see 4 Restatement (Second), Torts § 908 (1). We have determined that punitive damages are appropriate in this case.

The jury in the case before us found, as a matter of fact, that the conduct of this defendant was such as

---

[38] The Oregon Supreme Court in *State ex rel. Young* v. *Crookham,* 290 Or. 61, 66, 618 P.2d 1268 (1980), in disposing of a *Roginsky* v. *Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967) argument, said: "Hindsight demonstrates that the apprehension of the *Roginsky* court was heavily exaggerated. Of the 1,500 cases, in only 3 did juries award punitive damages. The vast majority of cases were settled and the financial destruction feared by the Second Circuit did not come to pass. See generally, Rheingold, 'The MER/29 Story—An Instance of Successful Mass Disaster Litigation,' 56 Cal. L. Rev., Part 1, 116 (1968)." See also *Campus Sweater & Sportswear* v. *M. B. Kahn Construction Co.,* 515 F. Sup. 64, 108–109 (D.S.C. 1979), aff'd, 644 F.2d 877 (4th Cir. 1981).

to justify an award of punitive damages. Until it is demonstrated to the contrary, we believe that our courts, both appellate and trial, have reasonable means, that, if properly employed, will serve to utilize punitive damages where needed. A trial court can certainly, and should not hesitate to, decide in a given case that the evidence proffered on the issue is insufficient to be submitted to a jury for its determination. In the event that it submits the issue to the jury, the practice used in this case of simply letting the jury decide whether the evidence justifies such an award that is later to be calculated by the court itself interposes another element of judicial restraint upon the amount to be awarded. Moreover, while not involved in this case, we note that General Statutes § 52-240b, which concerns punitive damages in product liability actions, provides that punitive damages "may be awarded" if proven under that statute and, if the trier of fact determines that such damages are to be awarded, then "the court shall determine the amount of such damages not to exceed an amount equal to twice the damages awarded to the plaintiff." This statute requires that the court determine the amount within the limits prescribed therein. Another factor assuring judicial supervision over punitive damages lies in the trial court's general control over verdicts, including setting a verdict aside in a proper case. An appellate court, on review of questions of law, also functions to afford appellate judicial scrutiny of issues involving punitive damages.

The element of deterrence is still present in an award of punitive damages and to suggest that maximum deterrence may have been attained in the past and that the particular corporate conduct meriting punitive damages may have been discontinued is no answer in every case where such damages are sought. This is so because the purpose of punitive damages is not merely to deter

a particular defendant from future misconduct but to deter others from committing similar wrongs. Thus, we are not persuaded that punitive damages were inappropriate in this case.

With this conclusion, we now address the defendant's claim that punitive damages are not appropriate in this case as they relate to the third count for the loss of consortium. In making its claim that punitive damages were erroneously awarded on the third count, the defendant claims that the verdict form on the second count specifically limits such damages to Cecelia Champagne as administratrix of the estate of Wilfred Champagne and it was therefore erroneous to include in that verdict any liability to her individually for any punitive damages. It also claims that, based on the complaint used at trial, any such recovery on the second count was limited to Cecelia Champagne as such administratrix. The defendant has properly raised the issue of the propriety of an award of punitive damages concerning the third count and we address it.

Our analysis begins with the recognition that the plaintiff's claim as administratrix in the first count in strict product liability and the plaintiff's individual claim for loss of consortium in the third count are two separate causes of action. There can be no argument that the right of the estate of Wilfred Champagne to seek a recovery against the defendant in strict product liability constitutes a cause of action. We have acknowledged that a claim for a loss of consortium constitutes a viable cause of action on behalf of the spouse whose marital partner has been injured or killed. See *Izzo* v. *Colonial Penn Ins. Co.,* 203 Conn. 305, 310, 312, 524 A.2d 641 (1987); *Ladd* v. *Douglas Trucking Co.,* 203 Conn. 187, 189, 195, 523 A.2d 1301 (1987); *Hopson* v. *St. Mary's Hospital,* supra, 487. While there are, thus, two causes of action, we have said that a cause of action for the loss of consortium is "derivative of the injured

spouse's cause of action." *Hopson* v. *St. Mary's Hospital,* supra, 494; *Izzo* v. *Colonial Penn Ins. Co.,* supra, 312; *Ladd* v. *Douglas Trucking Co.,* supra, 195. But although it is "derivative," it is still a separate cause of action, dependent for its assertion on the legal viability of the cause of action in the injured party. See, e.g., *Ladd* v. *Douglas Trucking Co.,* supra; *Hopson* v. *St. Mary's Hospital,* supra, 496. Its nature, while no bar to its status as a separate cause of action, as we have said, is such that it "is not truly independent, but rather derivative and inextricably attached to the claim of the injured spouse." *Izzo* v. *Colonial Penn Ins. Co.,* supra, 312. We have already determined that any recovery by a spouse on a loss of consortium count in a strict product liability action is to be diminished proportionately by that percentage of comparative responsibility found by the jury, if any, attributable to the injured spouse in a recovery by him or on his behalf on a strict product liability count in the same lawsuit.

We determine that punitive damages can be permitted as to a loss of consortium count in such a lawsuit. We do so for the following reasons. Although "derivative," as it has been called, the claim for loss of consortium is a separate cause of action from that for the spouse on the strict product liability count. As such, the law authorizes a recovery by each of these two different parties for the defendant's violation of their respective rights. See *Izzo* v. *Colonial Penn Ins. Co.,* supra, 310; *Hopson* v. *St. Mary's Hospital,* supra, 487. It seems to us that the core of the defendant's conduct in this case is not merely its manufacture and distribution of the product involved in this case but the injury it caused. In cases of this type, where conduct of a defendant in a strict tort liability action has been found to be such as to warrant the imposition of punitive damages on the strict liability count under the rule of such cases as *Doe* v. *Heintz,* 207 Conn. 17, 526 A.2d 1318

(1987), and *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, we see no logical or conceptual barrier to the imposition of such damages on a consortium count, especially because the nature of the defendant's conduct was a wrong not only to the decedent but also to his or her spouse. The defendant's claim that to grant punitive damages on a consortium claim in a strict liability case constitutes a "windfall" is wide of the mark. The individual plaintiff is in this case as a direct result of the defendant's conduct toward her decedent and is in the exercise of her individual rights in a cause of action, separate from that of the decedent's estate in the first count. Additionally, recovery of punitive damages in this case is also not a "windfall" because it merely compensates her for her costs of litigation less her taxable costs in a cause of action that she alone had the right to institute. Moreover, her costs of litigation less her taxable costs are directly related to her net award of damages on the third count by virtue of the same contingency fee agreement as is applicable to the first count. Inasmuch as we decided that the plaintiff was entitled to punitive damages on the third count, we must now address whether she, in her individual capacity, has waived her right to claim them in this case. We say this because, arguably, the trial court's instructions are such that they may be interpreted as permitting them on the first count only. In making this observation, we note that neither the plaintiff nor the defendant excepted to the trial court's instructions concerning punitive damages. For the reasons set out below, we conclude that the plaintiff did not waive her right to claim punitive damages on the third count.

The charge to the jury is reviewed as a whole to see if the case is presented to the jury so that no injustice will result; see, e.g., *State* v. *Shifflett,* 199 Conn. 718, 754, 508 A.2d 748 (1986); *Van Steensburg* v. *Lawrence*

*& Memorial Hospitals,* 194 Conn. 500, 507, 481 A.2d 750 (1984); and to see if it gave the jury "a reasonably clear comprehension of the issues presented for their determination under the pleadings and upon the evidence and were suited to guide the jury in the determination of those issues." *McKirdy* v. *Cascio,* 142 Conn. 80, 87, 111 A.2d 555 (1955). We have said that in our task of reviewing jury instructions, we view the instructions as part of the whole trial. *State* v. *Kurvin,* 186 Conn. 555, 563, 442 A.2d 1327 (1982).

It is significant to keep in mind that, during its instructions, the trial court told the jury that its function as to the second count was to examine the evidence upon which the imposition of punitive damages was allegedly to be based and then, by its verdict on that count, to indicate "yes" or "no" on that issue. In doing so, the trial court instructed that it was to decide whether the defendant's conduct amounted to "wilful, wanton, intentional or malicious disregard for the rights of others or reckless indifference to the rights of others." It specifically told the jury that the question of the amount of damages, should it return a plaintiff's verdict on that count, was not for the jury to decide but that that would be taken care of later by the court. The jury did its assigned charge on the second count and indicated that the defendant's conduct was such that punitive damages should be awarded. It was not concerned with the amount to be awarded or the method of calculation. In that regard, " '[w]e cannot assume that lay jurors know what lawyers and judges know.' *People* v. *Harris,* 52 Mich. App. 739, 741, 218 N.W.2d 150 (1974)." *State* v. *Tatem,* 194 Conn. 594, 600, 483 A.2d 1087 (1984). Therefore, even if the instructions were capable of being understood as meaning that punitive damages could only be awarded on the first count, the error, if any, was harmless in that the ultimate question as to punitive damages to be

awarded was a question of law for the trial court. Moreover, the trial court's action, on February 8, 1988, after hearing posttrial motions concerning the damages on both the first and third counts, is to be accorded some weight. This is so because that decision to do so was made by the very court who had formulated the jury instructions in the first instance.

The verdict on the second count, as the defendant points out, states that the jury found the issues on that count for Cecelia Champagne, administratrix, only and not also for her individually, in which latter capacity she brought the third count for loss of consortium. It therefore contends that the trial court erred on February 8, 1988, when it awarded punitive damages to Cecelia Champagne, both as administratrix and individually. We do not agree.

We do not consider the verdict on the second count fatally defective so as to bar the trial court from assessing punitive damages in favor of Cecelia Champagne, both as administratrix and individually, under the unique circumstances of this case. The body of the verdict on that count certainly contains "an intelligible finding so that its meaning is clear"; see *Kilduff* v. *Kalinowski,* 136 Conn. 405, 409, 71 A.2d 593 (1950); i.e., that the jury had decided that the defendant's conduct on the evidence and under the trial court's instructions was such that punitive damages were to be awarded. The omission of the words "and individually" after Cecelia Champagne, administratrix, is not fatal so as to foreclose the later assessment, on February 8, 1988, by the trial court of punitive damages on the third count. We note that the assessment of such damages in the second count based on both the first and third counts was made by the same trial court that had formulated the jury instructions in the first instances and, as noted, this is to be accorded weight.

Additionally, on this branch of the matter, the defendant's brief states that "[d]uring the course of arguments on post-trial motions before Judge Koletsky on February 8, 1988, over objection by counsel for the defendant, Judge Koletsky included in his computation of the damage award on the second count the amount of compensatory damages found by the jury on the third count of the complaint in favor of the plaintiff Cecelia Champagne, *individually*." (Emphasis in original.) We have examined the transcript filed in this court concerning the trial court's action on posttrial motions under date of February 8, 1988, and we do not find any such objection. It is the burden of counsel, especially on claiming error, to ensure that this court is provided with an adequate record. See, e.g., *State* v. *One 1977 Buick Automobile,* 196 Conn. 471, 480, 493 A.2d 874 (1985); *DeMilo* v. *West Haven,* 189 Conn. 671, 680, 458 A.2d 362 (1983). Under the circumstances, we regard the defect in the verdict form in the second count as one of form and not of substance.[39] Therefore, we do not find any waiver by the plaintiff of her right, in her individual capacity, to make the claim that she is entitled to punitive damages on the third count for loss of consortium.[40]

There is no error on the defendant's appeal as to the first count and as to so much of the second count that includes the plaintiff administratrix's attorney's fees of one third of the verdict on the first count which was computed in accord with the contingency fee agreement

---

[39] This is not to say that we would come to a similar result where the verdict form, unlike the one on the second count, which was, for all practical purposes, akin to an interrogatory, involved more than one plaintiff or more than one defendant or both. See, e.g., *Clark* v. *Shaw,* 143 Conn. 114, 117, 119 A.2d 912 (1956).

[40] We distinguish the defendant's claim that the pleadings do not permit an award of punitive damages on the third count for loss of consortium. An examination of the pleading discloses that the third count incorporates by reference the allegations of the second count for punitive damages.

and there is no error as to so much of the second count which allowed the plaintiff the cost of her disbursements. There is error on the defendant's appeal as to the third count, the judgment of which is set aside and a new trial ordered thereon limited to the issue of damages. There is error as to so much of the second count as includes the plaintiff's attorney's fees of one third of the verdict on the third count as computed in accord with the contingency fee agreement.[41] There is no error on the cross appeal.

In this opinion the other justices concurred.

---

[41] On remand, the measure of damages on punitive damages, in the event they are awarded, is to be determined by the same law as they were at the trial we are reviewing in this appeal. That is, this will be done under the rule of such cases as *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 477 A.2d 988 (1984), and *Doe* v. *Heintz,* 204 Conn. 17, 30, 526 A.2d 1318 (1987).

This measure of damages is different from that employed where a case, seeking, inter alia, punitive damages, is tried under the strict product liability statute enacted in 1979. See General Statutes §§ 52-572m through 52-572r. General Statutes § 52-240b of the act, entitled "Punitive damages in product liability actions," provides: "Punitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of such damages not to exceed an amount equal to twice the damages awarded to the plaintiff."