[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISIONON MOTION TO SET ASIDE FOR JUDGMENT NOTWITHSTANDING VERDICT
These motions were well briefed by both counsel. The court has addressed the issue raised by the motion for judgment notwithstanding the verdict but only the issue of excessive verdict in the motion to set aside the verdict. The other matters raised in the motion to set aside the verdict were extensively argued during the trial and the court has really nothing to add to its prior decisions on these matters. The two issues discussed are also of central importance to this case.
1.
In this case the jury's verdict was in the amount of $1,750,000. The defendant through counsel claims the verdict is excessive.
The defendant relies chiefly on the case of Buchanan v.People's Express, 205 Conn. 106 (1987). That case involved a suit where the plaintiff sought damages from his former CT Page 6718 employer for the emotional distress he claims to have suffered as a result of the failure of the defendant to allow him to continue his group health coverage as required by statute after he was terminated from employment. The jury awarded a verdict in the amount of $51,595.94 and the Supreme Court sustained the defendant's appeal from the trial court's refusal to order a remittitur. The court found that "from December 15, 1984 until early March 1985 the plaintiff was under the impression that he had no medical coverage. As a result, he became withdrawn, very depressed, unable to eat or sleep, upset and teary, and felt inadequate and irresponsible as a husband and father" 205 Conn. at pp. 167-168. The plaintiff had out of pocket damages of $1595.94 but there is no indication this was for medical or psychiatric treatment. That is really it. On this basis the verdict of $51,594.95 was not surprisingly found to be excessive.
The court quoting from an earlier case said that:
 "The issue is not whether this court would have awarded more or less. It is whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to offend the sense of justice and compel a conclusion that the jury (was) influenced by partiality, prejudice, or mistake." 205 Conn. at page 175, quote from Gorczyca v. New York, N.H. HR Co., 141 Conn. 701, 703 (1954).
The court candidly stated the damage award was "so grossly excessive as to shock the conscience of this court"205 Conn. 177. Although the opinion pays due deference to the notion that damages should be remitted only if such action does not trespass upon the prerogatives of the jury, id at page 176, it could be argued that it came dangerously close to doing so and perhaps departed from or interpreted Gorczyca in a new way when in footnote 10 at page 176 the court acknowledged that "the defendant has not pointed to any basis other than the amount of the award, for a funding that the jury was influenced by partiality prejudice or mistake." The court went on to say the "excessiveness appears attributable to outrage over the total lack of regard for the rights of the plaintiff." Where there is no claim of error or inadequacy of the jury instructions on damages it remains to be explained CT Page 6719 how the prerogatives of the jury aren't interfered with given the facts of Buckman. Buckman is not the usual case, an eminent authority notes that "for the first time in several decades, a tort verdict was held excessive" in the Buckman
case, Connecticut Practice Moller Horton, commentary to PB § 320 at page 514. The last previous case where a remittitur was ordered was in the 1955 case of Lengel v. New Haven GasLight Co., 142 Conn. 70, some thirty two years before Buckman. Since Buckman another case also authored by the same Justice who delivered the opinion in that case found a damage award shocked the sense of justice and was disproportionate to the injury, Champagne v. Raybestos-Manhattan Inc., 212 Conn. 509,556-558 (1989). That case involved a claim of loss of consortium where the award was for $320,000. The court noted that the evidence of lack of consortium was sparse with only minimal reference to the frequency of the spouse's return to the family after the injury. When the decedent was home the couple did live together as husband and wife and he did do "minor things" around the house not "big things as he did before" For some portions of the period the decedent spouse worked and the plaintiff never claimed to be in financial difficulty. The court had trouble with the quality and quantity of the testimony.
There have been several cases since Buckman where the damage award was upheld against a claim that it was excessive,Berry v. Loiseau, 223 Conn. 786, 808 (1992), Oakes v. NewEngland Dairies Inc., 219 Conn. 1, 13 (1991), Todd v. Glines,217 Conn. 1, 7 (1991), Bartholomew v. Schweizer, 217 Conn. 671,686 (1991), Samose v. Hammer-Passero Norwalk ChiropracticGroup PC et al, 24 Conn. App. 99, 108 (1991). These cases especially Todd and Bartholomew seem to reflect a different emphasis than that expressed in Buckman. In Todd the court noted that "assessment of damages is particularly within the province of the jury" id at page 7 and both seemed to tie once again the excessiveness issue directly to traditional concerns about partiality or mistake. In the Bartholomew case at page 687 the court noted:
 "The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to this verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the CT Page 6720 conclusion that the jury was influenced by partiality prejudice, mistake or corruption." quote from Mather v. Griffin Hospital, 207 Conn. 125, 139 (1988).
All of this gives little guidance to a trial judge faced with deciding whether a jury verdict is excessive. Perhaps the cases can be viewed as saying that in light of the necessary respect we should have for a person's right to a jury trial a damage award should not be reduced unless there is extrinsic evidence of partiality, corruption, prejudice, or mistake or there is some fair criticism that could be made of the jury instructions especially where a case by its very nature is such that a jury may be swept by outrage or sympathy and the instructions do not adequately caution the jury a to these factors. Otherwise a jury verdict should not be viewed as excessive unless it is extremely high and there was scant and completely unpersuasive evidence at trial as to damages as in Buckman or Champagne.
Can the latter be said of this case? First there were no exceptions to the court's charge on damages. The closing argument of the defendant focused entirely on the liability issue and no mention was made as to appropriate damages. Little or no cross-examination of the plaintiff's doctor, plaintiff or of the family focused on the damages issue. The plaintiff offered several witnesses on his damage claim and in closing argument counsel presented a rather involved and detailed presentation which attempted to calculate the damages for the jury. Given all of this it is not surprising that having found liability a high award would be given which could be explained on grounds other than prejudice, corruption, partiality, or mistake.
As to the outrage factor referred to in Buckman, the closing argument was a strong one. However, during the trial there was no appeal to raw emotion or attempts to incite the jury that the court saw as a pattern or in any way went beyond the bounds of propriety. The jury was charged not to let sympathy influence them and that the plaintiff had the burden of proving damages by a fair preponderance of the evidence and that damages could not be based on speculation.
The defendant notes medicals totaled $31,213.72 and lost wages were $13,987.60. These are not exactly di minimus CT Page 6721 amounts especially as to the medicals. The defendant argues there was not lengthy on-going medical treatment and notes the plaintiff only missed six months of work. He now works full time and has sought no medical treatment for several years prior to trial. There was no good evidence of permanency and no evidence as to defendant's condition as to scarring.
The court believes this does not present a full picture of what the jury could base its award upon. The court will refer to evidence presented by the plaintiff which was largely if not entirely unrefuted and the character of which made it highly credible.
Mr. Stebbins was 23 at the time of the fire. He had a life expectancy of 50 years. The explosion threw him into a wall and temporarily blinded him severely burning all exposed skin areas — he crawled out of the room where the explosion occurred with his flesh burning. He was bought to intensive care in critical condition and fed intravenously for an extended period.
He was wrapped in bandages for several days, his head swelled to the point where there were no discernible features. He experienced burns and graft wounds to about 20% of his body including hands, arms, eyelids, lips, face and upper thighs. He truly looked terrible after the accident for months. Pictures introduced at trial revealed the horrific condition of several parts of his body.
During his 5 week hospital stay he was subjected to daily cutting of his skin and debridements, a whirlpool treatment several times a day followed by a painful tearing off of bandages. He had two major debridement operations on his arms and hands and two skin grafts where skin was taken from his thighs and applied to his hands arms and face. A diamond surgical wheel was used to flatten the skin areas after these procedures. He suffered a collapsed lung which caused pain and a lung pump was inserted into him for several days.
Upon his return home he underwent an extensive rehabilitation program under Dr. Belinke's direction. He was confined to home for six months except for visits to a physical therapist and initially he was completely bedridden. He had to wear various devices and splints night and day for CT Page 6722 up to two years after his return home. He was given an exercise program which he continued for two years. He must apply salves to his skin every day.
This leads to a discussion of permanency. Dr. Belinke testified that burn victims suffer great traumatic shock and often come away from such incidents as changed people. The plaintiff said he still has fear of being hurt at work and has had recurrent nightmares up to the time of trial about being enveloped in flames. The mother and brother testified that he has been depressed since the fire, he is shy and lost his self-esteem, confidence and natural exuberance. He appeared to them to be a different person.
Dr. Belinke presented slides which showed extensive scarring on the plaintiff's arms and testified to the court's recollection that the condition would not improve. Photographs of hand scars and fingernail pitting were also introduced. The doctor also testified there is permanent scarring on the donor sites. The grafted skin will remain rubbery and less sensitive than the original skin. The plaintiff is more susceptible to future burns; he has a diminution of sensation and touch. His face appears blotchy.
The plaintiff testified he cannot go outside without covering up for more than a half hour. He was an outdoors person but now cannot expose himself to the elements in the same way. He no longer skis and goes fishing and cannot expose himself to the harsh elements. It is evident that this family man with a young daughter will not be able to engage fully in outdoor activities.
The court has relied on the plaintiff's recitation of the evidence as to damages in this case but it appears to comport with the court's memory of the evidence.
This is not a case such as Buckman. This court at least is not willing to invade the jury's province and arbitrarily lower its award based on no ascertainable standards or on pretrial negotiations and offers. The award may be higher than the court would have awarded if the case had been tried to the court, perhaps substantially higher. But I suppose that is the point, this man chose a jury trial. The court cannot say that in light of the evidence presented as to damages the jury had no basis for its verdict or that such CT Page 6723 evidence was peculiarly minimal and unpersuasive. The court will not grant a remittitur.
2.
The defendant has presented a brief in support of its motion for judgment notwithstanding the verdict. It basically argues that the board of education is not an agent of the town but has exclusive control under Section 10-220 C.G.S.A of school property therefore the town cannot be responsible to the defendant for any injuries he suffered in the explosion occurring in the control room of this highschool.
The court will make some brief remarks on this issue. It was extensively briefed and argued at trial and the considerations presented by the current brief were in large part presented by counsel for the defendant at the trial.
First let it be said that this area of the law is a quagmire with no very recent appellate cases raising, or discussing let alone deciding the issues presented.
First let it be said that some confusion is presented by the co-existence of two statutes, § 10-220 and § 10-240 which, depending on how they are read, can appear to be contradictory as to the question of whether or not a board of education is an agency of a town in maintaining school property.
Admittedly it was dealing with questions of sovereign immunity but the court in R.A. Civitello v. New Haven, 6 Conn. App. 212,218 (1986) did say the following:
 "A board of education is an agency of the state in charge of education in a town . . . Local boards of education are not agents of the state, however, in performing each and every mandated function . . . Local boards of education act as agents of the state when fulfilling the statutory duties imposed upon them by the legislature in light of the state constitutional mandate to furnish public education . . . Local boards are also agents of the towns, subject to the law governing municipalities, when acting on behalf of the municipality in its function of mandating control over the public schools within the municipalities limits . . . see CT Page 6724 General Statutes § 10-220, 10-240.
The court in R.A. Civitello makes the following extensive quotation from Board of Education v. Dow Chemical Co.,40 Conn. Sup. 141, 142 (1984).
 "In determining whether a local school board is afforded the protections consistent with the doctrine of sovereign immunity, the courts look to whether the suit would operate to control or interfere with the activities of the state. Cahill v. Board of Education, supra, 102; Lostumbo v. Board of Education, 36 Conn. Sup. 293, 295, 418 A.2d 949 (1980). The maintenance of school property is not encompassed within the educational activities of the state. Lostumbo v. Board of Education, supra, 294-95. The funding source for such building and maintenance is primarily a local responsibility. Id. We conclude that a local school board acting to recover damages arising from the construction of the physical plant of a school building is not acting as a state agent and, therefore, would not be entitled to employ the doctrine of sovereign immunity as a shield from the defense of the statute of limitations."
See also Cheshire v. McKenney, 182 Conn. 253, 256 et seq. (1980), cf Little v. Booth, 10 Conn. LRptr 290 (1993). Fowlerv. Enfield, 138 Conn. 521, 530 (1952) and Board of Educationv. Ellington, 151 Conn. 1, 6 (1963) are not of much help since those cases clearly involved activities having to do with the provision of education which when the board so acts makes it an agent of the state.
Cases that say the doctrine of sovereign immunity doesn't apply to a board of education when it exercises maintenance functions as opposed to producing educational services necessarily rest on the proposition that such boards when so acting are not agents of the state. Admittedly pronouncements that in such situations they are agents of the town are dicta but powerful dicta insofar as § 10-220a is sought to be used to establish by way of legislative fiat that such boards cannot be agents of the town despite factual indications to the contrary. Is the purpose then of § 10-220 then to grant some kind of immunity to towns when boards of education CT Page 6725 otherwise acting as town agents engage in building maintenance which has nothing to do with the constitutional requirement upon the state to provide education? In light of § 10-240
there is no analytical reason to provide towns with such protection or justification for such a gratuitous protection from suit.
Here the record is replete with evidence that the board in this instance was acting in fact as an agent of the city. The building was erected under city contract which created the dangerous condition. The city owned the property, its representatives negotiated and signed the 1985 Code update contract which brought the plaintiff in contact with this dangerous condition, funding came from general funds and its representatives reviewed all project expenditures. The court will not read § 10-220a a mandating a finding of non-agency when the facts show an agency relationship.
The motion to set aside and grant judgment notwithstanding the verdict is denied.
Corradino, J.