## JONATHAN RODRIGUEZ ET AL. *v.* HOUSING AUTHORITY OF THE CITY OF NEW HAVEN

| Superior Court | Judicial District of New Haven | File No. CV960384127S |

Memorandum filed August 22, 1997

*Irving J. Pinsky,* for the plaintiffs.

*Lynch, Traub, Keefe & Errante,* for the defendant.

LAGER, J. The plaintiffs, Jonathan Rodriguez, a minor child, and his mother, Jomayra Rodriguez, brought the present action to recover for Jonathan Rodriguez' alleged injuries due to his exposure to lead-based paint while he resided in an apartment owned by the defendant, the housing authority of the city of New Haven. The complaint alleges that on February 28, 1994, Jonathan Rodriguez underwent an initial venous lead test resulting in a blood lead level of eighteen micrograms per deciliter of blood (ug/dl). Notice of the plaintiffs' intention to commence an action was sent to the defendant on May 12, 1995.

The defendant has moved for summary judgment on the ground that the plaintiffs did not comply with the notice requirements of General Statutes § 8-67 in that notice was filed more than six months after the plaintiffs' cause of action accrued. In support of the motion, the defendant has submitted its request for admissions, which are deemed admitted under Practice Book § 239.[1] The plaintiffs have objected to the motion for summary judgment and have provided an affidavit of Jomayra Rodriguez in opposition.

A party moving for summary judgment has the burden of demonstrating both that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Practice Book § 384; *Union Trust Co.* v.

---

[1] Practice Book § 239 provides in pertinent part: "Each matter of which an admission is requested is admitted unless . . . the party to whom the request is directed files and serves upon the party requesting the admission a written answer or objection addressed to the matter . . . ." The admissions were unanswered and, therefore, are deemed admitted.

*Jackson*, 42 Conn. App. 413, 416, 679 A.2d 421 (1996). Summary judgment may be granted on the basis of admissions by a party who did not respond to requests to admit, if that party's counteraffidavit fails to raise a material issue of fact. *Orenstein* v. *Old Buckingham Corp.*, 205 Conn. 572, 576, 534 A.2d 1172 (1987). If, however, the party opposing the motion presents an evidentiary foundation to demonstrate the existence of a genuine issue of material fact, the motion for summary judgment must be denied. *Doty* v. *Mucci*, 238 Conn. 800, 805–806, 679 A.2d 945 (1996). The court must "view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Water & Way Properties* v. *Colt's Mfg. Co.*, 230 Conn. 660, 664, 646 A.2d 143 (1994).

The admitted facts are as follows. The minor plaintiff, Jonathan Rodriguez, was diagnosed on February 28, 1994, with an elevated level of lead in his blood. As of February 28, 1994, he resided at apartment A-1, 374 Front Street, New Haven, a multifamily residential dwelling owned by the defendant. The first written notice of an intention to file a claim against the defendant, in regard to the claim that Jonathan Rodriguez was exposed to lead while in the apartment, is a letter sent from the attorney for the plaintiffs dated May 12, 1995. The notice letter was sent more than six months after the date that Jonathan Rodriguez was diagnosed as having an elevated level of lead in his blood. The plaintiffs claim that the elevated level of lead in the blood of Jonathan Rodriguez is due to exposure to lead from apartment A-1, 374 Front Street, New Haven.

In her opposing affidavit, Jomayra Rodriguez states that on February 28, 1994, when she learned that her son had an elevated blood lead level, she did not know where the lead came from but "was concerned as to whether the source of the problem was on or within the premises where we lived," the apartment on Front

Street. She further states that she "promptly and repeatedly contacted the [defendant] and requested them to send someone over to our home, but they did not come. Finally, the Department of Health sent someone here in March 1995."

Section 8-67 provides in pertinent part that "[a]ny person injured . . . within boundaries of property owned or controlled by an authority, for which injury such authority is or may be liable, may bring an action within two years after the cause of action therefor arose to recover damages from such authority, provided written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed . . . within six months after the cause of action therefore arose." The time limitations of § 8-67 act to limit a plaintiff's ability to recover, as do typical statutes of limitations. *White* v. *Edmonds*, 38 Conn. App. 175, 184, 659 A.2d 748 (1995). "Section 8-67 did not create liability where none existed; rather, it provides for procedural limitations on the ability to recover on a cause of action already available. As such it is a condition subsequent to recovery that may be specially pleaded by a defendant to bar recovery." Id., 185.[2] In the present case, the defendant has pleaded lack of timely compliance with § 8-67 as its second special defense.

The issue presented by the defendant's motion for summary judgment is when the plaintiffs' cause of action arose within the meaning of § 8-67. In the context of a motion for summary judgment, the court's role is not to decide whether the plaintiffs complied with the statute but whether an issue of material fact regarding compliance with the statute exists. "A material fact is

[2] Even when, as here, the plaintiffs plead compliance with § 8-67, the plaintiffs have no burden of proving compliance because it is not an essential element of the cause of action. *White* v. *Edmonds*, supra, 38 Conn. App. 183.

one that makes a difference in the outcome of a case." *Union Trust Co.* v. *Jackson*, supra, 42 Conn. App. 418. Since untimely compliance with § 8-67 is sufficient to defeat the plaintiffs' case, it is a material fact. See *Catz* v. *Rubenstein*, 201 Conn. 39, 48, 513 A.2d 98 (1986).

The defendant maintains that the court may look to cases defining the term "cause of action" as it is contained in other statutes to determine its meaning as used in § 8-67. The plaintiffs do not disagree that in other contexts a cause of action has been defined to accrue "when a plaintiff suffers actionable harm. . . . Actionable harm occurs when the plaintiff discovers or should discover, through the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused such injury." (Citation omitted.) *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 521, 562 A.2d 1100 (1989), citing *Catz* v. *Rubenstein*, supra, 201 Conn. 43.[3]

Similarly, in a negligence action, "[a] breach of duty by the defendant and a causal connection between the defendant's breach of duty and the resulting harm to the plaintiff are essential elements of a cause of action . . . . [W.] Prosser & [W.] Keeton, Torts, (5th Ed.) § 30, pp. 164–65; *Calderwood* v. *Bender*, 189 Conn. 580, 584, 457 A.2d 313 (1983); *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620 (1982); *Busko* v. *DeFilippo*, 162 Conn. 462, 466, 294 A.2d 510 (1972); *Moore* v. *Bunk*, 154 Conn. 644, 649, 228 A.2d 510 (1967). They are therefore necessary ingredients for 'actionable harm.' " *Catz* v. *Rubenstein*, supra, 201 Conn. 44. The focus on when a cause of action accrues must be on the plaintiffs'

---

[3] *Champagne* and *Catz* interpreted General Statutes § 52-584. The defendant cites cases that apply the language from these cases to other statutes or situations: *Roberts* v. *Caton*, 224 Conn. 483, 490, 619 A.2d 844 (1993) (General Statutes § 52-577d); *Merly* v. *State*, 211 Conn. 199, 206, 558 A.2d 977 (1989) (General Statutes § 4-148); *Tyler* v. *Schnabel*, 34 Conn. App. 216, 220–21, 641 A.2d 388 (1990) (fraudulent conveyances).

knowledge of facts rather than on applicable legal theories. Id., 47.

The defendant contends that the cause of action arose when Jonathan Rodriguez was diagnosed with an elevated blood lead level on February 28, 1994. The plaintiffs contend that the cause of action did not arise before March 28, 1995, when the apartment was inspected for lead paint and may not have arisen until April 24, 1995, the date when written notice that the inspection revealed excessive levels of lead in the apartment was sent. Neither contention is dispositive, as a matter of law, of the timeliness of the notice in the present case.

An elevated blood lead level, alone, does not necessarily mean that the defendant's conduct was the source of the minor plaintiff's lead exposure.[4] Lead, which remains toxic indefinitely, is prevalent in the environment. Legacy of Lead: America's Continuing Epidemic of Childhood Lead Poisoning (Environmental Defense Fund, March 1990) pp. 15–16. While lead-based paint is a significant source of exposure for children, other sources—including roadside and soil residue from leaded gasoline, other contaminated soil, drinking water, food, and commercial products—"make a notable contribution" to childhood lead exposure. Id., pp. 17–22; see P. Mushak & A. Crocetti et al., The Nature and Extent of Lead Poisoning in Children in the United States: A Report to Congress (Agency for Toxic Substances and Disease Registry, Public Health Service, U.S. Department of Health and Human Services, July 1988). In a Connecticut study of the paint, dust, soil and water at the homes of nineteen children who were

---

[4] Indeed, in lead paint cases the defense generally seeks to determine other potential sources of the minor child's exposure. See In Re: Lead Paint Litigation, Defendant's Court Approved Non-Standard Interrogatories and Requests to Produce Directed to the Plaintiffs, interrogatories 14, 15, 16, 17, 18 and 19.

found to have blood lead levels greater than twenty-five ug/dl between October, 1988, and July, 1989, "16 of the 19 homes had elevated lead levels in two or more of those sources" and paint, although containing elevated lead levels, was not the sole source of elevated lead in any of the homes. Moreover, in one case, the probable lead source was the child's sandbox and, in another, the probable source was the child's school. Pilarski, et al., Sources of Lead in the Environments of Children with Elevated Blood Lead in Connecticut. This study also pointed out that the "emphasis on paint . . . may [be] inappropriate for children with moderately elevated lead levels, for whom studies have shown significant contribution from lead in dust, soil and water."[5]

Thus, the question is what facts were available to the plaintiffs, and in particular Jomayra Rodriguez; see *Burns* v. *Hartford Hospital*, 192 Conn. 451, 458 n.4, 472 A.2d 768 (1984) (knowledge of parent must be imputed to minor child); as of February 28, 1994, when they learned of Jonathan Rodriguez' elevated blood lead level, to show that defective lead-based paint conditions, resulting in excessive levels of lead, in the apartment or on the premises, were the probable source of Jonathan Rodriguez' exposure, and whether due diligence was exercised to discover the source of the lead exposure and whether it was caused by an act or omission of the defendant. Jomayra Rodriguez' affidavit raises a dispute about whether she exercised reasonable care to confirm her suspicions that the source of her son's elevated blood lead level was the apartment in

---

[5] The minor plaintiff's blood lead level is alleged to have been eighteen ug/dl on February 28, 1994, a moderately elevated level, and below that which triggers the requirements of General Statutes § 19a-111, which provides in pertinent part that "[u]pon receipt of each report of confirmed venous blood lead level equal to or greater than twenty micrograms per deciliter of blood, the local director of health shall make or cause to be made an epidemiological investigation of the source of the lead causing the increased lead level . . . ."

which she resided. She admits that she was concerned about whether her apartment was the source of the lead. She then states that she promptly and repeatedly contacted the defendant to send someone over to her home, implying an effort on her part to pursue her concerns.[6] An inspection revealing levels of lead in excess of that permitted by law, however, did not take place until March, 1995, when it was conducted by the department of health.[7]

The date when the plaintiffs discovered or should have reasonably discovered that there were defective lead-based paint conditions, resulting in exposure to excessive levels of lead, in the apartment or on the premises is a genuine issue of material fact in the present case. Since the defendant has failed to sustain its burden of demonstrating the absence of a genuine issue of material fact, its motion for summary judgment is denied.

---

[6] It may very well be that a fact finder would conclude that these efforts were not reasonably diligent if there is additional evidence presented, as alleged in paragraph nine of the first and second counts of the complaint, that the premises contained "peeling, chipped, flaking and deteriorating lead-based paint and dust from lead-based paint," and was in that condition on February 28, 1994. Furthermore, if there is evidence that a latent lead hazard existed prior to the tenancy, as alleged in paragraph four, then a fact finder might reasonably conclude that the cause of action accrued on February 28, 1994. These are, however, questions of fact which cannot be resolved by a motion for summary judgment.

[7] Neither side has provided an explanation of why this inspection occurred in March, 1995, and not sooner. See General Statutes § 19a-111; see also footnote 5 of this opinion.